GRIFFIN, Respondent, *v*. OPINION PUBLISHING CO., Appellant.

(No. 8355.)

(Submitted January 13, 1943. Decided June 8, 1943.)

[138 Pac. (2d) 580.]

(502)

504

*Mr. D. J. Sias* and *Mr. George E. Hurd,* for Appellant, submitted an original, a reply and a supplemental brief; *Mr. Hurd* argued the cause orally.

*Messrs. Burns & Thomas*, and *Mr. Karl E. Frisbee,* for Respondent, submitted an original and a supplemental brief; *Mr. Harry L. Burns* argued the cause orally.

MR. JUSTICE ADAIR delivered the opinion of the court.

In a civil action for libel, the plaintiff James Griffin recovered a judgment for money damages against defendant Opinion Publishing Company for two articles published in defendant's weekly newspaper, the Chinook Opinion, and from such judgment the defendant has appealed.

Numerous specifications of error are assigned, among them

being that the complaint fails to state a cause of action for libel and that the evidence fails to prove any libel.

The first of the two newspaper articles complained of was published in the issue of the Chinook Opinion of September 11, 1941, and reads:

"This will be a Scoop on the Journal. Gather round you boy scouts and girl scouts to learn a few new wrinkles in civic affairs.

"The Chinook City council last Thursday night had a hot one tossed on the table when they were asked to settle a claim of James Griffin rather than continue a law suit that James Griffin has brought against the city. The claim is of dubious legality as the court has not had a chance to say whether the city should or shouldn't pay.

"Mr. Griffin was represented by his attorney, Mr. Harry Burns, who also happens to be our duly elected city treasurer. This in itself is a new wrinkle in civic affairs as few men can both serve and sue the city at the same time. Just how the city can legally pay a claim of dubious legality is going into the higher branches of the law that leaves most of us a little dizzy. In case you are still following this piece and haven't fallen off somewhere, there is a new development on how to make friends and influence an Alderman. We leave this for home study and naming no names we give, as your next assignment a bit of home work: read document No. 145268 on file in the office of the Blaine County Clerk and Recorder.

"What happened to the claim? Action deferred until next meeting."

The other article complained of appeared in the September 25, 1941, issue of defendant's newspaper and reads:

"It Sure was a Scoop. Well that certainly was a scoop on the Journal that we ran two weeks ago, so labeled. Our contemporary loudly admitted it last week and had an attorney write it up for them. A very nice admittance of an oversight and very poor newspaper work on the part of the Journal in that its

after-reading

editor was really in on the ground floor when the story originally broke and carelessly ( ? ) failed to write it up.

"A sad part of the admission, however, is the attempt, probably due to the rut in which the writer's profession naturally puts him, to use the very evidence of the truth of our story to make it out misleading and, by misapplying the insinuations made in our simple little scoop, drag those not otherwise implicated into the 'deal'."

In our opinion, no cause of action for libel is stated in the plaintiff's complaint nor is any such cause established by the evidence in the case.

"To create liability for defamation there must be an un- privileged publication of false and defamatory matter of another which (a) is actionable irrespective of special harm, or (b) if not so actionable, is the legal cause of special harm to the other." (Restatement of the Law of Torts, Chap. 24, sec. 558, p. 139.)

The law of Montana conforms to the above Restatement.

"*Libel is a false and unprivileged publication* by \* \* \* printing \* \* \* which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Sec. 5690, Revised Codes of Montana 1935.)

Thus to be actionable, to constitute libel, the publication (1) must be false and (2) it must be *unprivileged* and (3) it must be *defamatory*.

In the instant case, it is admitted that the defendant published the two articles complained of. However, the evidence established the articles to be (1) true,—not false, (3) privileged, —not unprivileged, and it fails to show that the language used is defamatory. Under such circumstances there can be and is no libel.

"The truth of a defamatory statement of fact is a complete defense to an action for defamation." (Restatement of the Law of Torts, Chap. 24, sec. 582, p. 216.)

To give rise to a civil action for libel the words used must be either (1) actionable *per quod* or (2) actionable *per se.* Clearly the complaint fails to state a cause of action based upon words actionable *per quod* for there is no allegation whatever of any special damage. Further the record discloses that there is no proof of any special damage hence libel *per quod* is entirely eliminated from the case.

Plaintiff rests his entire case upon the contention that the words of the newspaper article are actionable *per se.* However, for words to be actionable *per se* their injurious character must be a fact of such common notoriety as to be established by the general consent of men so that the court takes judicial notice of it. Here the words appear to be clear and unambiguous and we fail to see where such words or the language of the newspaper articles charge plaintiff with the commission of any crime or that same may, by common notoriety, be said to be of such injurious character as to require the court to take judicial notice of it. ''Where the language complained of is clear and unambiguous, it is the duty of the court to determine whether it is actionable, either *per se* or *per quod*.'' (33 Am. Jur. sec. 294, p. 277.)

Absolute privileges are of two general classes, they being (1) the privilege which arises from the consent of the person defamed, and (2) the privileges which are conferred by law because of the occasion on which the defamatory matter is published.

''Privileges of the second class are based upon a public policy which recognizes that it is desirable that true information shall be given whenever it is reasonably necessary for the protection of one's own interests, the interests of a third person or certain interests of the public. In order that such information may be freely given it is necessary to protect from liability those who for the purpose of furthering the interest in question give information which though in fact untrue, they reasonably believe to be true and appropriate for the furtherance of such

interest." (Restatement of the Law of Torts, Chap. 25, sec. 584, pp. 224, 225.)

As before stated, we find nothing false nor defamatory in the two published articles but even though the published matter were both false and defamatory still it is the law that, "One who publishes false and defamatory matter of another is not liable therefor if (a) it is published upon a conditionally privileged occasion and (b) the occasion is not abused." (Restatement of the Law of Torts, Chap. 25, sec. 593, p. 241.)

"An occasion is conditionally privileged when the circumstances induce a correct or reasonable belief that (a) facts exist which affect a sufficiently important public interest, and (b) the public interest requires the communication of the defamatory matter to a public officer or private citizen and that such person is authorized or privileged to act if the defamatory matter is true." (Restatement of the Law of Torts, Chap. 25, sec. 598, pp. 260, 261.)

In Restatement of the Law of Torts, chapter 25, it is said:

"Section 606 General Principle.

"(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory, (a) is upon, (I) a true or privileged statement of fact, or (II) upon facts otherwise known or available to the recipient as a member of the public, and (b) represents the actual opinion of the critic, and (c) is not made solely for the purpose of causing harm to the other.

"(2) Criticism of the private conduct or character of another who is engaged in activities of public concern, in so far as his private conduct or character affects his public conduct, is privileged, if the criticism, although defamatory, complies with the requirements of Clauses (a), (b) and (c) of Subsection (1) and, in addition, is one which a man of reasonable intelligence and judgment might make." (Pages 275, 276.)

"* * * If the public is to be aided in forming its judgment upon matters of public interest by a free interchange of opinion,

510

it is essential that honest criticism and comment, no matter how foolish or prejudiced, be privileged. The fact that the criticism is fantastic is immaterial, and the extravagant form of its expression is unimportant.'' (Page 277.)

''* * * However, if the criticism is honest and is believed by the critic to be valuable for the public information, the fact that he would have refrained from publishing it if the person criticised had been his friend and not his enemy is not enough to destroy the privilege. * * * The privilege stated in Subsection (2), however, is applicable to so much of the private conduct or character as affects in any way the public conduct of such person. It is applicable, therefore, to a criticism of the private life of a public officer or candidate for office in so far as his private life affects his qualifications for office and to the motives which are supposed to inspire his public conduct. (See Sec. 607, Comment i).'' (Page 278.)

''Section 607 Public Officers and Candidates.

''(1) The privilege of criticism, stated in Section 606, includes a privilege to criticise the public conduct of all officers or employees of the United States, a State or Territory thereof, or a municipal corporation of a State or Territory, and all candidates for such office and applicants for such employment in so far as the conduct of such officer, employee or candidate is a matter of public concern to those to whom the criticism is published.

''(2) The privilege of criticism stated in section 606 includes a privilege to criticise the work of independent contractors which is being paid for out of public funds and the work of employees of such contractors.

''(3) The privilege of criticism stated in section 606 includes a privilege to criticise the public conduct of public officers of a foreign state.'' (Page 279.)

''* * * The public conduct of every public officer and candidate for office is always a matter of public concern in the community in which he holds or seeks office. * * * The concern

which all citizens have in the proper conduct of public affairs by public officials requires that they have a wide freedom to discuss among themselves the public conduct of their officers and the qualifications of those who seek public office. Those who hold such offices and those who offer themselves as candidates therefor, by so doing subject their public acts to honest criticism even though it be extravagant and unjustified. To make the critic's protection depend not only upon the sincerity of his criticism but also upon its being such as a reasonable man might make would tend to prevent the public from knowing much essential criticism. The advantages gained by the freedom of discussion stated in this Section are therefore sufficient to outweigh the danger that the reputation of public officers or candidates may suffer thereby. * * * The privilege of comment stated in this Section includes not only criticism of the manner in which executive officers exercise their discretion but also criticism of the manner in which they and their subordinates carry out their purely ministerial functions." (Pages 280, 281.)

"Illustration:

"1. A, the chief of police of X, while on duty, becomes intoxicated and gets into a fight with B. The C newspaper correctly states the facts and pronounces A unfit for his office. The comment is privileged." (Page 281.)

"A privileged publication is one made: * * * 3. In a communication, without malice, to a person interested therein, by one who is also interested, or by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or who is requested by the person interested to give the information;

"4. By a fair and true report, without malice, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof." (Sec. 5692, Rev. Codes 1935.)

"Although there are rulings to the contrary, most authorities hold that the question whether the publication complained

512

of was privileged, either absolutely or conditionally, by reason of its character or the occasion upon which it was made, is a question of law to be decided by the court whenever the evidence is undisputed, * * *." (33 Am. Jur. sec. 296, pp. 279, 280.)

It is only when the evidence is conflicting that the question of whether the publication is privileged or not is to be submitted to the jury.

The Constitution of Montana provides: "No law shall be ■ ■ passed impairing the freedom of speech; every person shall be free to speak, write, or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts." (Art. III, Sec. 10.)

While our Constitution like that of Missouri, Colorado, South Dakota and Wyoming provides that in libel suits "the jury, under the direction of the court, shall determine the law and the facts", yet the decisions clearly show that the function of the court and jury is not greatly different in the trial of libel from what it is in other cases.

In other words, it is for the court and not the jury to pass upon demurrers to the complaint; upon the admissibility of the evidence; upon motions for nonsuit; upon motions for a directed verdict; upon motions for a new trial and upon motions to set aside verdicts or vacate judgments. The law is as stated in *Diener* v. *Star-Chronicle Pub. Co.*, 230 Mo. 613, 132 S. W. 1143, 1145, 33 L. R. A. (n. s.) 216, 217: "A demurrer lies to a petition sounding in tort for libel the same as to any other petition, if certain conditions are present—this, in spite of the constitutional provision (Article 2, sec. 14, of the Bill of Rights [Ann. St. 1906, p. 135]) that, in libel, 'the jury, under the direction of the court shall determine the law and the facts.' To illustrate: If A sue B for libel without matter of innuendo or inducement on the theory that the words published are libelous

*per se,* and they are not libelous *per se,* the sufficiency of A's petition may be challenged by demurrer, and is for the court. Again, if A sue B for libel for words not actionable *per se,* and the pleader, claiming they bear a hidden or latent libelous meaning because of certain extrinsic circumstances, sets such extrinsic circumstances forth by prefatory allegations by way of inducement and follows up the libelous words by an innuendo applying the words to the matter so pleaded by way of inducement, in such cases, such innuendo should not be a forced and unnatural construction and application of the words, but a reasonable and natural construction and application of them. A vice of that sort can be reached by demurrer, and is for the court. Again, if the words of the libel are ambiguous, and the pleader can only put a libelous tang or edge upon them by a wholly unnatural and forced construction and tries to do so by an innuendo, that vice can be reached by demurrer, and is for the court. So, if the petition be not challenged by way of demurrer, *in limine,* and the case be fully developed on trial, and if under the pleadings and evidence no case is made the court may take the case from the jury by a peremptory instruction in the nature of a demurrer. So far as above indicated, libel suits, though *sui generis* (in a sense), are subject to those rules of practice found wise and useful in administering justice generally in the courts.''

In Restatement of the Law of Torts, Chapter 26, under ''Topic 2. Function of Court and Jury,'' it is said:

''(1) The court determines whether a communication is capable of a defamatory meaning.

''(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.'' (Sec. 614.)

''(1) The court determines whether the subject of defamatory criticism is a matter of public concern.

''(2) Subject to the control of the court whenever the issue arises, the jury determines whether criticism was merely the expression of an opinion upon known facts or upon a true or

privileged statement of fact or whether it carried with it a false implication of defamatory facts and whether it represented the honest opinion of its author and whether it was expressed for a proper purpose.'' (Sec. 618.)

''(1) The court determines whether the occasion upon which the defendant published the defamatory matter was privileged.

''(2) Subject to the control of the court whenever the issue arises, the jury determines whether the defendant did or did not abuse a conditionally privileged occasion.'' (Sec. 619.)

The plaintiff James Griffin held the tail-end of certain special improvement district bonds. After the other bonds of the series had been paid out in the order of their registration only about $78 remained in the fund for the payment of plaintiff's bonds.

Plaintiff did not accept this $78 available to him. Instead, on March 6, 1941, plaintiff presented to the city council a claim against the City of Chinook for the sum of $800 plus interest based upon the failure of the plaintiff to receive such sum from the special improvement district. The claim was promptly disallowed by the city council. On the following day, March 7, 1941, the plaintiff James Griffin filed suit against the City of Chinook to compel it to pay him the $800 and interest which he claimed was due on his special improvement district bonds. For his attorney-at-law to commence and prosecute this suit against the City of Chinook, the plaintiff employed and retained the city treasurer of the defendant city.

Chinook had two weekly newspapers, namely, the Chinook Opinion and the Chinook Journal. At the time of their happening, neither of these newspapers published anything whatever regarding either the filing, presenting or disallowance of plaintiff's claim, nor at the time action was instituted did either paper publish or inform its readers that the plaintiff James Griffin had commenced suit against the city for $800 and interest based on the rejected claim.

Subsequently and on September 4, 1941, there occurred a meeting of the city council of the City of Chinook whereat was

present councilman Leo N. Sanford who was also the publisher of the Chinook Journal. S. V. Anderson, a representative of the Chinook Opinion, was also among those in attendance at the council meeting. There the city's treasurer, as representative, agent and attorney for the plaintiff James Griffin, offered to compromise for $400 the law suit which his client James Griffin had brought against the city. As there was only about $78 in the fund for the payment of Mr. Griffin's special improvement district bonds the question arose as to the source from which the balance of the money to make up the amount of the compromise offer could be obtained. It was suggested that the money could be taken from "an unclassified fund" and used to pay off Mr. Griffin. The city attorney was consulted. He advised against the use of the city's moneys from the so-called "unclassified fund" for the purpose of settling with Mr. Griffin. Councilman Sanford testified: "We had conflicting legal advice on it and we were just discussing it." No definite action was taken at this meeting on plaintiff's offer in compromise.

In the next issue of the Chinook Opinion there appeared the article of September 11, 1941. No mention was made in the Chinook Journal of Mr. Griffin's offer to compromise his law suit against the city. Thus was the Chinook Opinion first to publish a report or account of what occurred at the council meeting of September 4, 1941. To thus get ahead of one's competitor,—to be the first to publish,—to beat one's rival to the street with the news,—constitutes, in newspaper slang, "a scoop", which word has a very definite and well-understood meaning among newspaper men and women everywhere. Clearly there is nothing false and nothing defamatory in publishing the true statement that the article of September 11, 1941, "will be a scoop on the Journal."

The Boy Scouts movement was started for the very purpose of training the rising generation in the essentials of good citizenship and through this movement is the youth taught how the machinery of government, school district, township, town,

city, county and state operates. On certain occasions the youth are permitted to move into these laboratories for a day or a fraction of a day and to assume the role of mayor, councilman, city attorney, chief of police, etc. With these common and well-known facts in mind, it is clear that the words "Gather round you boy scouts and girl scouts to learn a few new wrinkles in civic affairs" served simply as a means of arresting the attention of those readers who, like the Boy Scouts, are interested in good citizenship and in good government, and reporting to them that there was a serious question as to whether plaintiff had a legal right to certain moneys which he was endeavoring to have supplied him from the public treasury of the city. We find nothing false nor defamatory in the above statement.

The article recites: "The Chinook City Council last Thursday night had a hot one tossed on the table when they were asked to settle a claim of James Griffin rather than continue a law suit that James Griffin had brought against the city." As the council was gathered about the council table, the city's treasurer on behalf of his client Mr. Griffin made the offer to settle at a discount his client's claims, demands and suit against the city. The powers of municipal officers to expend from the public treasury the taxpayer's moneys is limited by law and unless the money is expended in accordance with the law the expenditure will constitute a violation of the law. That the offer to compromise presented legal difficulties that were most bothersome is shown by the fact that the plaintiff's attorney and the city's attorney gave out divergent opinions and were unable to agree on the problem presented. Conflicting advice from attorneys as to the law governing particular transactions and problems makes it difficult for laymen to determine exactly what to do or whose advice to follow. It puts such laymen "on the spot" or "on a hot spot," so to speak, for they know not which, if either, of the conflicting opinions on the law is the correct one and therefore the one to follow. We see nothing false nor defamatory in referring to this knotty legal problem on

which the lawyers disagreed as ''a hot one tossed on the table.''

The article continues, ''The claim is of dubious legality as the court has not had a chance to say whether the city should or shouldn't pay.'' With one attorney saying Yes and the other saying No the question of the legality of the plaintiff's claim was certainly considerably clouded. Doubts were evidently raised in the minds of the councilmen as to their right or authority to compromise the suit, otherwise they would not have taken more time to consider the question by deferring action thereon until their next meeting.

Special improvement district bonds certainly are not the obligations of the city. (*Lumbermen's Trust Co.* v. *Town of Ryegate,* 9 Cir., 61 Fed. (2d) 14.) This court has held with respect to such bonds, ''there is no duty or obligation resting upon the city other than to enforce and obey the provisions of the special improvement district laws; if this is done, and still a loss is suffered by reason of deficiencies in that law, the loss falls upon the holders of the bonds and warrants, and not upon the city.'' (*Stanley* v. *Jeffries* and *Stanley* v. *City of Great Falls,* 86 Mont. 114, 284 Pac. 134, 139, 70 A. L. R. 166.) From the facts appearing in the record and in light of the former decisions of this court, we find nothing false nor defamatory in referring to plaintiff's claim, demand and suit as ''of dubious legality.''

Mr. Griffin made certain demands upon the city for money and these demands were rejected and resisted by the city. Thus arose a conflict between Mr. Griffin and the city. To represent and act for him in this conflict, Mr. Griffin employed one who was already employed by and on the payroll of the city, namely the city's treasurer. The duties of the city treasurer are prescribed by law. (Sec. 5034, Rev. Codes 1935.)

The opinion of the city treasurer regarding the legality of the proposed transaction evidently did not jibe with that of the city attorney. Public moneys were demanded from the public treasury to compromise the suit and all concerned knew or they

ought to have known that with such matters the public is concerned and that the offer to compromise would invite public comment and, possibly, public criticism. When one privately employs the city's treasurer to sue for and obtain for him money claimed to be legally due and owing him from the city, we think such transaction and employment sufficient to justify the newspaper comment that "This in itself is a new wrinkle in civic affairs as few men can both serve and sue the city at the same time."

"Just how the city can legally pay a claim" for which it is not obligated is quite difficult of solution. Even with the aid of "the higher branches of the law." Quite recently has this court held that special improvement district bonds are not general obligations of the city, and that their payment is strictly limited to the fund provided by statutes and city ordinances adopted thereunder. (*State ex rel. Griffith* v. *City of Shelby,* 107 Mont. 571, 87 Pac. (2d) 183.)

The article further states: "In case you are still following this piece and haven't fallen off somewhere, there is a new development on how to make friends and influence an Alderman. We leave this for home study and naming no names we give, as your next assignment a bit of home work: read document No. 145268 on file in the office of the Blaine County Clerk and Recorder. What happened to the claim? Action deferred until the next meeting." The language just quoted plaintiff contends is the strongest used in the articles but we do not find therein any words actionable *per se.*

It was true that the council deferred until a subsequent meeting its action on plaintiff's offer to compromise his lawsuit. It is true there was a document No. 145268 on file in a public office but its character or contends were not disclosed by either of the published ,articles and therefore cannot be taken into account in determining whether the published words were actionable *per se.* (*Wimmer* v. *Oklahoma Pub. Co.,* 151 Okl. 123, 1 Pac. (2d) 671.).

No accusation of the commission of bribery or of the commission of any other crime is legitimately conveyed by the statement that, ''there is a new development on how to make friends and influence an Alderman.'' For quite some time various newspapers have been publishing a syndicated column much read by the public entitled ''How to Win Friends and Influence People.'' There is a book, by Dale Carnegie, so entitled. It is widely advertised as ''The most popular work of non-fiction of our time.'' Well over two million copies of the book have been sold. Neither the syndicated news column nor the book referred to have anything to do with bribery nor do they deal with unlawful influence nor with the commission of crime.

Although plaintiff contends that the words of the published article are of themselves actionable *per se,* yet he was not content to rely upon the published words alone, i. e., in themselves for the meaning intended and conveyed by their use. Instead, by innuendo, plaintiff attempts to add to their common and accepted meaning by pleading in his complaint ''that by the publication of said article as aforesaid the defendant intended to and did assert and charge and intended to be understood as charging and asserting, and by the readers of said newspaper was in fact understood as charging and asserting that the plaintiff herein was guilty of offering and giving to Leo N. Sanford, a duly elected, qualified and acting Alderman * * * a bribe and that this plaintiff had been and was guilty of the crime of bribing a member of a city council.'' Plaintiff, not having pleaded any special damage, is not permitted to place this unreasonable and far-fetched construction upon simple words which he claims are actionable *per se.* Most certainly the innuendo thus attempted to be pleaded was and is a forced, strained and unnatural one. (*Sweaas* v. *Evenson,* 110 Minn. 304, 125 N. W. 272.)

The articles were neither false nor unprivileged. The public and the taxpayers of Chinook had a right to know of the claim which plaintiff had presented against the city. They had a

right to know the facts concerning the suit which plaintiff filed against the city. They had a right to know that plaintiff had employed the city's treasurer as his attorney to force the city to pay his special improvement district bonds. They were entitled to know of the attempt made to compromise the suit for $400.

Every person has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose. The management of local affairs by the various authorities such as town or city councils, school boards, boards of health and the like is a matter of public concern. "The editor of a newspaper has the right, if not the duty, of publishing, for the information of the public, fair and reasonable comments, however severe in terms, upon anything which is made by its owner a subject of public exhibition, as upon any other matter of public interest; and such a publication falls within the class of privileged communications for which no action can be maintained without proof of actual malice." (*Gott* v. *Pulsifer*, 122 Mass. 234, 23 Am. Rep. 322.)

"The right of freedom of speech, of fair comment with an honest purpose in matters of public concern, is on the foot of *pro bono publico* and founded on public policy. Free discussion is the foundation on which free government itself is builded. That lost, all is lost; the two exist or perish together. They mean the same thing. It is only in despotism that one must speak *sub rosa,* or in whispers, with bated breath, around the corner, or in the dark on a subject touching the common welfare. It is the brightest jewel in the crown of the law to seek and maintain the golden mean between defamation, on one hand, and a healthy and robust right of free public discussion, on the other." (*Diener* v. *Star-Chronicle Pub. Co.,* supra.)

In this action no special damage having been alleged nor proven, the plaintiff to be entitled to damages was required to plead and prove that the published language and words complained of, *in themselves,* alone and unaided by any innuendo whatever, were actionable, i. e., that the published

words are actionable *per se*. This plaintiff has wholly failed to do. Defendant's demurrer to the complaint, defendant's objection to the introduction of any testimony made at the outset of the trial, and defendant's motion for a directed verdict in its favor at the close of all the testimony in the case were meritorious. Failure to sustain them constituted prejudicial error, for no cause of action for libel is stated in the complaint nor is any such cause established by the evidence in the case. The judgment is therefore reversed and judgment for defendant is ordered.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANDERSON and MORRIS concur.

MR. JUSTICE ERICKSON concurs in the result.

Rehearing denied June 23, 1943.