No. 80-225

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

---

TIMOTHY B. SKINNER,

Plaintiff and Respondent,

vs.

PAUL G. PISTORIA,

Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District,
In and for the County of Cascade.
Honorable R. D. McPhillips, Judge presiding.

Counsel of Record:

For Appellant:

James W. Zion argued, Helena, Montana

For Respondent:

Smith, Baillie and Walsh, Great Falls, Montana
James R. Walsh argued, Great Falls, Montana

---

Submitted: June 18, 1981

Decided: SEP 11 1981

Filed: SEP 11 1981

Thomas J. Kearney
_____
                              Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Defendant Paul G. Pistoria appeals from a judgment entered by the Cascade County District Court following a jury verdict in favor of plaintiff Timothy B. Skinner. The jury found the defendant liable for defamation of the plaintiff's character and awarded damages of $26,294. Although several issues are raised, we dispose of this appeal by holding that the defendant's publication was made in the course of an official government meeting; it was therefore a privileged publication which would not subject the defendant to liability for defamation.

The defendant, Pistoria, has been active in Great Falls politics and community affairs for many years, serving most recently as a member of the Montana House of Representatives during the 1981 session. He has characterized himself as a "political gadfly" and has developed the reputation of being an outspoken critic of the Great Falls city government.

Pistoria testified that sometime before February 1976, he began receiving anonymous telephone calls from four or five callers who stressed that Pistoria should do something because three named police officers, including the plaintiff, were allegedly misusing police department "buy funds." These "buy funds" are supplied by the federal government to enable local law enforcement authorities to set up purchases of illegal drugs during narcotics investigations. Pistoria testified that he believed the information that he was given because he received several calls which repeated the same information from callers who seemed knowledgeable about the information they were giving.

On March 16, 1978, Pistoria again received an anonymous call conveying the same information. Pistoria stated that he recognized the caller's voice from previous calls. That same day, Pistoria prepared on Montana House of Representatives stationery a letter which he intended to read at the next meeting of the Great Falls City Commission. He then took the letter to state senator Patrick Ryan and asked for Ryan's advice on the matter. Ryan testified that he also had been pursuing the same matter, and although he was surprised that Pistoria was working along the same lines, he did not discourage Pistoria from presenting the letter to the city commission.

On March 21, 1978, at the next regularly scheduled meeting of the city commission and during time normally reserved for comment by the public, Pistoria read his letter, which states as follows:

"Great Falls City Commissioners
"City Manager
"Chief of Police
"Civic Center
"Great Falls, Montana

"Gentlemen:

"I received a phone call today from an unknown person, who stated: 'I am sure you would like to know what is happening in our city police department.' The person did not identify himself. He mentioned that there are a few policemen involved in cases whereby Crime Control buy funds are not being distributed through the proper channels, and that they were being misused by Lt. Jim Cook, Lt. Timothy Skinner, Sgt. Donald Zeman, maybe others.

"During the conversation he also stated that much emphasis was made on how important it was to finance the STEP Program, which was adopted approximately one year ago, under the supervision of Sgt. Wayne Jacobson. This program was recently terminated. Why?

"He stated that these problems have been brought to the attention of the City and County Attorney, and wondered why this was

-3-

not investigated and made known to the public. In no way am I personally involved in these accusations, but if such is true, I think it should bear investigation."

Pistoria also placed a copy of the letter on the press table at the meeting. Although reporters from the Great Falls Tribune and the Montana Television Network were both present, he had no discussion with either of them. Later, however, both the Great Falls Tribune and the Montana Television Network News carried the story.

At the time this event took place, the plaintiff was a lieutenant in the Great Falls Police Department, and was one of five candidates being considered for promotion to captain. That position would have initially paid about $75 more per month than the plaintiff was making as a lieutenant. As a result of Pistoria's letter and the subsequent news reports, the police department postponed any promotions to captain positions for about one year. The plaintiff was, however, promoted to captain when the decisions were eventually made.

The plaintiff filed suit, contending that Pistoria's publication of the letter exposed the plaintiff to hatred, contempt, ridicule, and obloquy, caused him to be shunned and avoided, and injured him in his occupation as a police officer. He alleged that Pistoria acted out of a malicious, personal motive stemming from disapproval of certain previous city government actions. The jury found Pistoria liable to the plaintiff for $1,294 in actual damages and $25,000 in punitive damages.

Pistoria presents several issues for our consideration in this appeal, but because we hold that his publication was absolutely privileged, this holding disposes of the case.

-4-

The thrust of Pistoria's claim is that a communication made to the appropriate governmental authority, designed to initiate an investigation into public affairs, constitutes a publication made in an official proceeding and is cloaked with absolute immunity. We examine that claim "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." New York Times Co. v. Sullivan (1964), 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701.

One requisite of a defamation action is that the communication must be unprivileged. A privileged communication is one which, except for the circumstances under which it is made, may be defamatory and actionable. Storch v. Board of Dir. of East Mont. Reg. Five M.H.C. (1976), 169 Mont. 176, 181, 545 P.2d 644, 647. Privileged communications are of two general classes: (1) the privileges which arise from the consent of the person defamed; and (2) the privileges which are conferred by law because of the occasion on which the defamatory matter is published. Griffin v. Opinion Pub. Co. (1943), 114 Mont. 502, 508, 138 P.2d 580, 584.

Section 27-1-804, MCA, states that "[a] privileged publication is one made: . . .(2) in any legislative or judicial proceeding or in any other official proceeding authorized by law; . . ." (Emphasis added.) As used here, publication means "to make public." Black's Law Dictionary, (5th ed.) at 1105. We draw no distinctions between the reading of the letter to the city commission, its distribution to the press at the meeting, and its later treatment by the

-5-

media. We are concerned only with the fact that Pistoria made the information known publicly at the March 21, 1978 meeting. We are not concerned with the fact that he gave the media copies of his letter, because the proceeding was open to the public and the media was entitled to be present. Placing a copy of the information on the press table at a public meeting did not remove the cloak of immunity from Pistoria's publication, for we are also not concerned with the degree of publication. Whether there was publication here is not an issue since everyone agrees that publication occurred and Pistoria openly admits that his purpose was to make his information known publicly so that it might spur an investigation into the practices of the police department.

Freedom of expression upon public matters is secured by both the Montana Constitution and the First Amendment. ". . . it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." Bridges v. California (1941), 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192, 207. The 1972 Mont. Const., Art. II, § 6, recognizes the right to comment on public matters by stating that "[t]he people shall have the right peaceably to assemble, petition for redress or peaceably protest governmental action."

Strong policy reasons exist to assure free and open channels of communication between citizens and the authorities responsible for investigating public wrongdoing. Without protection, these important channels cannot effectively remain open. Protection is applicable when any recognized interest of the public is endangered, and that interest includes the honest and proper discharge of duties by public officers. The concern which all citizens have in the proper

it is to be made to the proper authorities responsible for the interest being expressed.

We recognize that unfounded and harmful charges cast under a shield of immunity may in some situations cause real and substantial injury. Nonetheless, the broad policy considerations supporting this immunity have been determined by the legislature to outweigh the likelihood that victims of defamatory statements may be denied appropriate redress. The advantages gained by the freedom to comment and criticize are sufficient to outweigh the danger that the reputations of public officers may suffer. Griffin, supra, 114 Mont. at 511, 138 P.2d at 585.

While the Montana legislature has created an absolute privilege, other jurisdictions have adopted a "rule of qualified privilege." Under that rule, a person making an allegedly defamatory publication is entitled to a privilege against liability for defamation only if it can be shown that his publication was not motivated by actual malice. For example, see Sowder v. Nolan (D.C. 1956), 125 A.2d 52 (one who writes to police chief about the misconduct of an officer is entitled to qualified privilege); Dempsky v. Double (1956), 386 Pa. 542, 126 A.2d 915 (woman who wrote letter to county controller charging that county employee was using county equipment for his own purposes was entitled to qualified privilege); Hancock v. Mitchell (1919), 83 W.Va. 156, 98 S.E. 65 (citizen with an interest that the duties of a public officer be properly performed can petition the proper authorities for action and is entitled to qualified privilege); Nuyen v. Slater (1964), 372 Mich. 654, 127 N.W.2d 369 (citizen interested in the proper administration of the local health department was qualifiedly privileged to express

-8-

conduct of public affairs by public officials requires that there be wide freedom to criticize that conduct, even though the criticism be unjustified or extravagant. Griffin, 114 Mont. at 510-11, 138 P.2d at 585. The duties of a public body, such as a city commission, often include supervision of public officers and may carry with it the power to remove or discipline those officers for neglect of duty or malfeasance in office. The responsible authorities should have extensive information concerning the conduct of those officers, in order that they might intelligently exercise their discretion. So that information may be freely given, it is necessary to protect those who give the information, even though it be untrue.

The legislature has chosen, through section 27-1-804(2), MCA, to confer a privilege upon publications made in an "official proceeding authorized by law." From the language used in this particular subsection, the privilege conferred is absolute and is therefore unaffected by the presence of malice. Although subsections (3) and (4) of section 27-1-804 do mention malice, subsections (1) and (2) do not. We held in Storch, supra, that section 27-1-804(1) confers an absolute privilege against liability for defamation. We now hold that subsection (2) also confers an absolute privilege.

Assuming, then, that Pistoria's statements were maliciously motivated as the plaintiff contends, as long as such statements were made at a proper proceeding, the presence of malice is irrelevant. The only requirement of subsection (2) is that the publication be made in an official proceeding authorized by law. We do not take this to mean that expression critical of the official conduct of any public officials may be made at any official meeting authorized by law, but rather that

concern to the administrator).

We hold that the March 21, 1978 regular meeting of the Great Falls city commission was an official meeting authorized by law; that it was proper for Pistoria to address the Great Falls city commission because it is the governing body of that city (section 1-7-2, Municipal Code of Great Falls); that it was proper for him to address the city manager because the manager supervises the police department (section 1-7-4(e), Municipal Code of Great Falls; section 7-32-4103, MCA); and that it was proper for him to address the chief of police because the police chief supervises all city police officers (section 7-32-4105(c), MCA). The judgment of the District Court is reversed and the action is ordered dismissed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

_____
Hon. Peter G. Meloy,
District Judge, sitting
for Mr. Justice John C.
Harrison