DA 15-0716

FILED

11/15/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0716

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 292

ROBERT LEE, JOHN HAGMAN, and MATTHEW FLESCH,

        Plaintiffs and Appellants,

    v.

BUCK E. TRAXLER, INDEPENDENT-OBSERVER, INC.,
a Montana corporation, JASON KORST, and the City
of Conrad, a municipality organized under the laws
of the State of Montana,

        Respondents and Appellees.

APPEAL FROM:    District Court of the Ninth Judicial District,
                In and For the County of Pondera, Cause No. DV 14-27
                Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Luke Casey, Lee Law Office PC, Shelby, Montana

        For Appellees:

                Robert B. Pfennigs, Mark T. Wilson, Jardine, Stephenson, Blewett
                & Weaver PC, Great Falls, Montana

                            Submitted on Briefs:  August 10, 2016

                                    Decided:  November 15, 2016

Filed:

                      _____
                                  Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 Appellants Robert Lee, John Hagman, and Matthew Flesch allege Appellees Buck E. Traxler and Independent-Observer, Inc., published defamatory statements about the group concerning an incident at a rest area northeast of Conrad, Montana. All parties filed motions for summary judgment on the issue of whether the publication constituted defamatory libel. The District Court determined that the statements were not defamatory and granted summary judgment in favor of Traxler and Independent-Observer, Inc. Lee, Hagman, and Flesch appeal. We affirm.

## ISSUE

¶2 We restate the issue on appeal as follows:

*Did the District Court err in granting summary judgment in favor of Defendants Traxler and the Independent-Observer?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On February 1, 2013, Appellants Robert Lee, John Hagman, Matthew Flesch, and another companion stopped at the Montana Department of Transportation Conrad Rest Area on Interstate 15. Ginny Winters, employed as the custodian of the Rest Area, was in the equipment room when the four men entered the premises. Fearing for her safety due to their loud and boisterous behavior, she locked herself in the equipment room and called the authorities. Conrad City Police Sergeant Jason Korst and two deputies from the Pondera County Sheriff's Office responded to the call.

¶4 At the Rest Area, Korst documented the following evidence: a beer can and spilled beer on the floor of one of the restrooms; urine covering the toilet and floor of a

2

restroom; stab marks on the windowsill presumably from a pencil; the suggestion box pencil and notepad, with pages torn out and scattered, on the floor of the Rest Area lobby; and a drawing of a naked female on one of the window dividers. Winters confirmed Korst's statements in her deposition, stating that she was able to observe through a vent one of the men throw a beer can into a restroom and one of the men drawing a picture of a naked woman on the window sill, and that, once the group had left the Rest Area, she noticed deep scratches on the wall of the Rest Area that weren't there prior to the group's arrival.

¶5    The Dissent takes issue with our statement of the material facts in this case, arguing that Plaintiffs have consistently maintained that the statements made by the Independent-Observer were false. However, Lee and Hagman both admitted in deposition that a member of the group had thrown a beer can into one of the restrooms. We also note that both Lee and Hagman admitted in deposition that they could not confirm or deny whether one of the group members had drawn a naked woman on the window divider, or scratched and punched holes on the window sills. Further, Flesch admitted in deposition that because of his level of intoxication, he could neither confirm nor deny whether he drew a naked woman on the window divider, or scratched and punched holes on the window sills. Finally, neither Flesch, Lee, or Hagman could confirm or deny whether a member of the group had urinated on the floor of the Rest Area. Therefore, their protests set forth in their Reply Brief, noted in ¶ 31 of the Dissent, are belied by the record.

¶6    Over the course of the two months following the Rest Area incident, the local Conrad newspaper, the Independent-Observer, would publish a total of three articles relating to the incident at the Rest Area. Due to their importance to the underlying cause of action, we briefly describe each article.

**The First Publication – February 7, 2013**

¶7    Six days after the Rest Area incident, the Independent-Observer published a brief article entitled "Vandals hit new I-15 rest area." The February 7th Article was three sentences in length:

> Friday evening four individuals, allegedly from Shelby, were caught vandalizing the new rest area just off the north exit off of I-15. Charges have not yet been filed but are expected to be before the week is over. The I-O will have more information as soon as it becomes available.

**The Second Publication – February 28, 2013**

¶8    Almost a month after the Rest Area incident, the Independent-Observer published an editorial, written by Traxler, the editor of the Independent-Observer, setting forth Traxler's version of the events that occurred on February 1st. The February 28th Article began by stating, "It's been a month now since the four 'gentlemen' allegedly from Shelby, and I use that with a great deal of sarcasm, stopped in at the new rest area just off of I-15." The article continued on in a manner consistent with colorful editorials; in relevant part, the article related certain statements that could be construed as factual assertions:

> One of the young men allegedly involved, rifled a beer can into a restroom. Along with that, the perpetrators allegedly relieved themselves not in the appropriate place.
>
> . . .

4

Others in the group took pencils from the suggestion box and drew naked women on the window sills, and scratched and punched holes in various places[.]

**The Third Publication – March 21, 2013**

¶9     Seven weeks after the Rest Area incident, the Independent-Observer published a third article, entitled "Two men charged in vandalism." The March 21st Article reads in full:

> Two of the four men from Shelby have been charged in the vandalism case at the new state-of-the-art rest stop just off I-15. Matthew Flesch, age 21, was charged with disorderly conduct and criminal mischief and Robert Lee, age 38, was charged with disorderly conduct in Conrad City Court. Both men have entered a plea of not guilty. Court dates have not yet been set. Chief Gary Dent commented that, "There was just no way to stretch this because they were there," this in reference to being charged with accountability.

Notably, Hagman was not identified in the March 21st Article.

¶10     Additionally, we note that each article briefly mentioned vandalism. The First Article stated that "four individuals . . . were caught vandalizing the new rest area." The Second Article was more detailed, commenting on the actions of the group and accusing them of "not thinking at all that they are causing the taxpayers' dollars to have the area cleaned up by their works of vandalism," and continuing on, stating, in relevant parts,

> Vandalism is an offense that takes place when a person(s) defaces property, other than their own, without permission. The act of vandalism is a crime against property that is punishable by jail time, monetary fines, or both.
> There is nothing in the MCA codes that says, "a little vandalism is no big deal."
> There is no such thing as a little vandalism.
> Vandalism laws have been put in the books to prevent the destruction of property both public and private. However, some people must feel that it doesn't apply to them, and as such they can go around and say, "It's no big deal, we got away with it in Conrad."

5

The Third Article began by noting that "[t]wo of the four men from Shelby have been charged in the vandalism case."

¶11 In response to the articles, Appellants filed a complaint in the Ninth Judicial District Court, Pondera County, against Traxler and Independent-Observer, Inc., on the grounds that the published articles constituted defamatory libel and, not relevant to this appeal, against the City of Conrad and Jason Korst for malicious prosecution.

¶12 Traxler and the Independent-Observer moved for summary judgment on the Appellants' claims of defamation, arguing the publications at issue were privileged and true, and that the Appellants had not suffered damages as result of the articles. The City of Conrad moved for summary judgment on the Appellants' claims of malicious prosecution, arguing that the Appellants had failed to prove all the elements of the claim. The District Court granted both motions and dismissed all claims against the Defendants. Lee, Hagman and Flesch appeal the grant of summary judgment in favor of Traxler and the Independent-Observer.

## STANDARD OF REVIEW

¶13 We review de novo a district court's grant or denial of summary judgment, applying the same criteria of M. R. Civ. P. 56 as a district court. *Pilgeram v. GreenPoint Mortg. Funding, Inc.*, 2013 MT 354, ¶ 9, 373 Mont. 1, 313 P.3d 839 (citation omitted).

## DISCUSSION

¶14 In Montana, the elements of a defamation claim are defined by statute. *See* §§ 27-1-801 to 27-1-821, MCA. Defamation is effected by either libel or slander. Section 27-1-801, MCA. Libel is defined as a "false and unprivileged publication by

6

writing, printing, picture, effigy, or other fixed representation that exposes any person to hatred, contempt, ridicule, or obloquy or causes a person to be shunned or avoided or that has a tendency to injure a person in the person's occupation." Section 27-1-802, MCA. The statute creates a three-part requirement for actions involving defamatory libel: first, the publication must be false; second, the publication must not be privileged; and third, the publication must be defamatory, in that it exposes the person to "hatred, contempt, ridicule, or obloquy," or causes "a person to be shunned or avoided," or has a tendency to injure the person in his or her occupation.

¶15 The foregoing statutory scheme must be interpreted in light of Article II, Section 7, of the Montana Constitution, which provides, in relevant part, "[i]n all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts." Mont. Const. art. II, § 7. This provision places the heart of any determination regarding defamatory libel directly within the province of the jury, subject only to determinations envisioned by the phrase "under the direction of the court." While we have held that "'there is no absolute prohibition against granting summary judgment in libel cases,'" we emphasize that, due to the unique nature of cases involving libel, a district court should take particular care when evaluating such motions. *Hale v. City of Billings*, 1999 MT 213, ¶ 15, 295 Mont. 495, 986 P.2d 413 (quoting *Williams v. Pasma*, 202 Mont. 66, 72, 656 P.2d 212, 215 (1982)).

¶16 In the instant case, the District Court's order granting the Appellees' Motion for Summary Judgment appears to be based on two theories: first, that the articles

themselves do not sufficiently identify the Appellants as to be actionable; and second, the fact that the community apparently knew about the incident prior to the publication of the articles precludes the articles from having a defamatory effect. However, in making its determination, the District Court did not analyze, and made only a passing reference to, the law defining defamatory libel in Montana. As a result, the skeletal nature of the District Court's order prevents this Court from determining whether the order is supported under the law of defamatory libel. In order to remedy this deficiency, we review the pleadings and documents filed in this case and undertake our own analysis to determine whether the grant of summary judgment was appropriate. "'Our *de novo* standard of review of summary judgment decisions allows us to review the record and make our own determinations regarding the existence of disputed issues of fact and entitlement to judgment as a matter of law.'" *Chapman v. Maxwell*, 2014 MT 35, ¶ 12, 374 Mont. 12, 322 P.3d 1029 (quoting *Wurl v. Polson School District No. 23*, 2006 MT 8, ¶ 29, 330 Mont. 282, 127 P.3d 436).

¶17 *Did the District Court err in granting summary judgment in favor of Traxler and Independent-Observer?*

¶18 In order to properly address a motion for summary judgment in a case involving defamatory libel, we first determine whether the publication is defamatory. *McConkey v. Flathead Elec. Coop.*, 2005 MT 334, ¶ 44, 330 Mont. 48, 125 P.3d 1121 (stating that the determination of whether a statement is defamatory is preliminary and within the province of the court). The facts of the instant case require a three-part analysis to determine whether the publication was defamatory: (1) whether the communication is

8

capable of bearing a particular and defamatory meaning; (2) whether the defamatory publication was aimed specifically at the person claiming injury; and (3) as required in the instant case, whether the defamatory publication meets the criteria to constitute libel *per se*.

¶19 Second, if the publication is defamatory, we determine whether the publication is privileged. *See McLeod v. State*, 2009 MT 130, ¶ 21, 350 Mont. 285, 206 P.3d 956 (citing *Hale*, ¶ 35). Third, if the publication is both defamatory and unprivileged, the inquiry turns to whether the publication is true or false.

¶20 In *Hale v. City of Billings*, we adopted guidance from the Restatement (Second) of Torts, noting that in cases involving libel "the court, as a preliminary finding, must determine 'whether a communication is capable of bearing a particular meaning; and . . . whether the meaning is defamatory.'" *Hale*, ¶ 17 (quoting Restatement (Second) of Torts § 614 cmt. a (1979)). In order to be defamatory, we have held that the words at issue

> "must be of such nature that the court can presume as a matter of law that they will tend to disgrace and degrade [the plaintiff] or cause him to be shunned and avoided. It is not sufficient, standing alone, that the language is unpleasant and annoys or irks him, and subjects him to jests or banter, so as to affect his feelings."

*Ray v. Connell*, 2016 MT 95, ¶ 11, 383 Mont. 221, 371 P.3d 391 (quoting *McConkey*, ¶ 45). This is a stringent test; "claims of defamatory libel may not be based on innuendo or inference," or "sarcastic or hyperbolic statements." *McConkey*, ¶¶ 47-48.

¶21 Under the structured analysis laid out above, we would normally first determine whether a publication was defamatory, and if so, whether the publication was privileged,

9

and only if we found that a privilege did not exist would we proceed to examine the truth or falsity of the publication to determine whether the question should be put before a jury. In the interest of brevity, however, we move to the third element of the test, as it is dispositive in this case.

¶22 Section 27-1-802, MCA, requires that a publication be false in order to qualify as libel. While we have previously held that the truth or falsity of the publication "is a determination for the jury alone to make," we have consistently stated that if the evidence is "so overwhelming that any other conclusion would be unreasonable," it is within the court's discretion to make the proper finding. *Hale*, ¶¶ 17-18. Further, we have stated that, when determining whether summary judgment is appropriate in a case involving libel, the movant "must establish the absence of genuine issues of material fact relating to the truthfulness of the publications in question." *Hale*, ¶ 13.

¶23 While we have previously held that there is not an "absolute prohibition against granting summary judgment in libel cases," we reiterate now that "[u]nless the evidence is so overwhelming that any other conclusion would be unreasonable, the issue of whether the statements were true or false is a determination for the jury alone to make." *Hale*, ¶¶ 15, 18 (internal quotations omitted).

¶24 In *Hale*, we interpreted this rule as requiring a court to determine whether the evidence was so overwhelming that "the statements were 'essentially truthful,' so as to preclude a jury from determining otherwise." *Hale*, ¶ 21. In that case, the Billings Police had provided information to a third party, who broadcasted "Hale's name, photograph, physical description, and charge against him on TCI's 'Yellowstone County's Most

10

Wanted' cable television program." *Hale*, ¶ 7. The broadcast indicated that persons shown were

> "fugitives" against whom a valid arrest warrant was in effect, that viewers should not attempt to apprehend any of the people as they "may be armed and dangerous," that viewers should call the Billings Police with any information regarding "these fugitives," and that all persons depicted on "Yellowstone County's Most Wanted" program were presumed innocent until proven guilty in a court of law.

*Hale*, ¶ 7. This Court determined from the record that Hale was "neither a 'most-wanted' suspect, nor a 'fugitive' from justice," noting that Hale's name was included in the broadcast only after being "chosen randomly from the three-to-five thousand outstanding arrest warrants on file with Billings Police and that his whereabouts were known at all times following the issuance of the arrest warrant." *Hale*, ¶ 21. Faced with these facts, we concluded that there was not overwhelming evidence that the statements were essentially truthful, and therefore truthfulness would have to be determined by a jury. *Hale*, ¶ 21.

¶25 Here, the concerns present in *Hale* do not exist given the testimony regarding the Rest Area contained in the record. The First and Third Articles were brief and contained only true factual statements. The Second Article stated, in relevant part,

> It's been a month now since four 'gentleman' allegedly from Shelby . . . stopped in at the new rest area just off of I-15.
>
> . . .
>
> One of the young men allegedly involved, rifled a beer can into a restroom. Along with that, the perpetrators allegedly relieved themselves not in the appropriate place.
>
> . . .
>
> Others in the group took pencils from the suggestion box and drew naked women on the window sills, and scratched and punched holes in various places[.]

11

¶26 The record reflects that Lee, Flesch, Hagman, and a fourth companion stopped at the rest area together, and that Officer Korst recovered a beer can from the bathroom, noticed urine on the floor of the Rest Area, and documented a crude drawing as well as holes that had been stabbed in the window sills. Appellants do not contest the facts relating to what occurred at the Rest Area, nor do they contest that the conduct at issue occurred while they were at the Rest Area. Instead, they argue that the articles imputed the actions to all group members, when only certain members of the group might have participated in the conduct at issue. Notably, none of the articles pinned specific instances of the alleged misconduct on Hagman, Flesch, or Lee. Instead, the articles refer to the general involvement of four individuals. The possibility that certain individuals participated in the conduct to differing extents does not render the statements made in the articles untrue. In light of the fact that Officer Korst and Ginny Winters documented facts tending to corroborate even the vibrant description contained within the Second Article, we find that it would be unreasonable for a jury to find that the statements contained within the three articles were anything but "essentially truthful," and that Traxler and the Independent-Observer have satisfied their burden of establishing the absence of a genuine issue of material fact relating to the truthfulness of the publication.

¶27 In conclusion, Hagman, Lee, and Flesch's defamatory libel allegations fail because, after a review of the record, we determine that the publication was not false within the meaning of our precedent regarding libel.

CONCLUSION

¶28    For the reasons set forth in this Opinion, we determine that the three articles published in the Independent-Observer do not constitute defamatory libel.  Therefore, Traxler and the Independent-Observer were entitled to summary judgment as to each of the three Appellants.  Because we affirm that the publications do not constitute defamatory libel, we do not reach the issue of whether any of the three articles were protected by the First Amendment.

¶29    Accordingly, we affirm the decision of the District Court.

/S/ PATRICIA COTTER

We Concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

Justice McKinnon, dissenting.

¶30    The Court creates an exception to the "structured analysis," Opinion, ¶ 21, which our jurisprudence has long recognized and carefully employed in defamation proceedings.  In doing so, the Court obscures distinctions between the functions of a jury and a judge and decides the quintessential issue of fact—truthfulness of the statements— which is committed to the sound discretion of the jury.

¶31    To begin, I disagree with the Court's characterization of Appellants' arguments: that is, that the statements are false because they arise from the possibility that certain

individuals participated in the criminal conduct to differing extents. Opinion, ¶ 26. We state: "Appellants do not contest the facts relating to what occurred at the Rest Area, nor do they contest that the conduct at issue occurred while they were at the Rest Area." Opinion, ¶ 26. The Court makes inferences and judgments regarding the falsity of the statements which are inappropriate and should be made by a jury. There is little doubt that the particular facts underlying these proceedings are convoluted and far from clear. Indeed, this is likely the reason the charges were ultimately dismissed. Nonetheless, that is precisely why falsity of the statements should be left to the jury's judgment and decision. Nothing in the record establishes what any particular individual did; thus, this Court takes a giant leap when it concludes otherwise by declaring the statements were true. Had the record overwhelmingly and definitively established the truthfulness of the statements, then perhaps the Court's actions would be more reasonable, provided other aspects of the "structured analysis" had been followed. However, the inability to "confirm or deny" does not establish as a matter of law, or overwhelmingly, the truthfulness of the statements. Moreover, Appellants have consistently maintained that the statements made by the Independent-Observer were false. More specifically,

> Flesch denies defacing any wall or windowsill at the rest area in any way and Hagman and Lee both deny having witnessed such conduct. Likewise, evidence on record does not support that any of the Appellants scratched or punched holes in the walls or windowsills. Finally, Winters testified that while she cleaned the rest area afterward, she did not find urine "in an inappropriate place."

Appellants' Reply Br., pp. 10–11. The Independent-Observer called Appellants "criminals" and "vandals" and accused Appellants of physically destroying the Rest

14

Area.  Although in the context of the criminal investigation Appellant elected to remain silent, Appellants aver in the instant proceeding that these statements are not true. Appellants denied committing acts of vandalism and obstruction of justice, which the Independent-Observer accused them of committing.  Indeed, the City of Conrad ultimately dismissed all charges.  Importantly, none of the individuals, as of the publishing dates of the articles, had been charged with a crime.  The Court fails to appreciate, first, that Appellants deny the Independent-Observer's statements they were "criminals" and "vandals," that they defaced the walls and urinated on the floors, and that they were "breakers of the law."  Second, the statements accused Appellants of having committed crimes prior to Appellants being charged with any offenses.  As such, the statements contained undisclosed facts which Appellants maintain could be proven false. While I appreciate the Court's eagerness to conclusively determine that the statements were true, the evidence of their truthfulness is not so overwhelming and clear that a jury should be precluded from determining which of the two permissible views ought to be accepted.

¶32    Montana's Constitution provides that "[i]n all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, *shall determine the law and the facts*."  Mont. Const. art. II, § 7, (emphasis added) In *Griffin v. Opinion Publishing Co.*, 114 Mont. 502, 512, 138 P.2d 580, 586 (1943), overruled on other grounds by *State v. Helfrich*, 277 Mont. 452, 922 P.2d 1159 (1996), we explained the meaning of "under the direction of the court" and concluded that "the decisions clearly show that the function of the court and jury is not greatly different in the

15

trial of libel from what it is in other cases." We held that "it is for the court and not the jury to pass upon demurrers to the complaint; upon the admissibility of the evidence; upon motions for nonsuit; upon motions for directed verdict; upon motions for a new trial and upon motions to set aside verdicts or vacate judgments." *Griffin*, 114 Mont. at 512, 138 P.2d at 586.[1] Accordingly, unless "the evidence is 'so overwhelming that any other conclusion would be unreasonable,' the issue of whether the statements were true or false is a determination for the jury alone to make." *Hale*, ¶ 18. I do not find the evidence of the truth or even substantial truth of the Independent-Observer's statements and

---

[1] The Court in *Griffin* explained,

> The law is as stated in *Diener v. Star-Chronicle Pub. Co.*, 230 Mo. 613, 132 S.W. 1143, 1145, 33 L. R. A. (n. s.) 216, 217: "A demurrer lies to a petition sounding in tort for libel the same as to any other petition, if certain conditions are present—this, in spite of the constitutional provision (Article 2, sec. 14, of the Bill of Rights [Ann. St. 1906, p. 135]) that, in libel, 'the jury, under the direction of the court shall determine the law and the facts.' To illustrate: If A sue B for libel without matter of innuendo or inducement on the theory that the words published are libelous *per se*, and they are not libelous *per se*, the sufficiency of A's petition may be challenged by demurrer, and is for the court. Again, if A sue B for libel for words not actionable *per se*, and the pleader, claiming they bear a hidden or latent libelous meaning because of certain extrinsic circumstances, sets such extrinsic circumstances forth by prefatory allegations by way of inducement and follows up the libelous words by an innuendo applying the words to the matter so pleaded by way of inducement, in such cases, such innuendo should not be a forced and unnatural construction and application of the words, but a reasonable and natural construction and application of them. A vice of that sort can be reached by demurrer, and is for the court. Again, if the words of the libel are ambiguous, and the pleader can only put a libelous tang or edge upon them by a wholly unnatural and forced construction and tries to do so by an innuendo, that vice can be reached by demurrer, and is for the court. So, if the petition be not challenged by way of demurrer, *in limine*, and the case be fully developed on trial, and if under the pleadings and evidence no case is made the court may take the case from the jury by a peremptory instruction in the nature of a demurrer. So far as above indicated, libel suits, though *sui generis* (in a sense), are subject to those rules of practice found wise and useful in administering justice generally in the courts."

*Griffin*, 114 Mont. at 512–13, 138 P.2d at 586.

undisclosed facts to be so overwhelming that it should be removed from consideration by a jury. In my opinion, the Court oversteps its role in concluding otherwise.

¶33 Perhaps a reminder of what the Restatement (Second) of Torts (1965) provides would be helpful. Section 614 explains:

> (1) The court determines
> (a) whether a communication is capable of bearing a particular meaning, and
> (b) whether that meaning is defamatory.
> (2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

Pursuant to this rule, the determination of whether the communication is capable of bearing the meaning ascribed to it by the plaintiff, and whether the meaning so ascribed is defamatory, is for the court to decide when reasonable minds cannot differ. If reasonable minds could differ as to the defamatory character of the statements, then the matter is left for decision by a jury. However, if the court decides that no reasonable person could conclude against the plaintiff upon either of these issues, then there is no further question for the jury to decide. If the court determines that the communication is both capable of bearing the meaning in question, and that it is defamatory, "there is then the further question for the jury, whether the communication was in fact understood by its recipient in the defamatory sense." *See* Restatement (Second) of Torts, § 614, cmt. B; s*ee also* *Hale*, ¶ 17, *McConkey*, ¶ 44, *Griffin*, 114 Mont. at 512, 138 P.2d at 586.

¶34 Applying the foregoing to the issue of whether the District Court correctly granted summary judgment for the Defendants limits the Court's role to preliminarily deciding whether the communication is capable of bearing the meaning ascribed and whether it is

defamatory. I disagree with the Court when it provides an exception to this "structured analysis" long employed in defamation proceedings and decides to begin its inquiry with whether the statements themselves are truthful. Opinion, ¶ 21. It is inappropriate for the Court to *first* decide whether the statements are true. That question is left for a jury to determine *after* the court has concluded that the statements may have the ascribed meaning and may be defamatory.

¶35 Thus, the only question with which this Court should be concerned is whether reasonable minds could differ regarding the meaning ascribed by the statements and whether the statements are defamatory. Here, because no special damages were pled in the complaint, the underlying cause of action must be deemed an action for libel per se. In addressing whether statements are defamatory and have the meaning ascribed to them, we have stated that,

> the defamatory words [must] be construed according to their usual, popular and natural meaning and their common acceptance in society; the words must also be viewed by the court without the aid of special knowledge possessed by the parties concerned; the words must be susceptible of only one meaning and that meaning must be opprobrious; and the words must also be construed in their entirety and with reference to the entire document.

*Tindal v. Konitz Contracting*, 240 Mont. 345, 355, 783 P.2d 1376, 1382 (1989) (citing *Wainman v. Bowler*, 176 Mont. 91, 94, 576 P.2d 268, 270 (1978)).

¶36 After reviewing the pleadings and record in this case, I would determine that the Second Article published by the Independent-Observer, when viewed without the aid of special knowledge, contains words that are defamatory in their usual, popular and natural meanings, and is subject to only one "opprobrious" meaning. Further, I would determine

18

that the statements contained within the Second Article do not consist entirely of sarcastic or hyperbolic statements. As noted, the "words must also be construed in their entirety and with reference to the entire document." This rule requires that we consider, in concert, all three of the articles published by the Independent-Observer. This conclusion is in line with our previous decisions in cases involving defamatory libel. *See Wainman*, 176 Mont. at 95, 576 P.2d at 270 (where this Court considered a series of articles in their entirety in order to find that the statements contained therein were not defamatory). I therefore would determine that the publications at issue are capable of bearing the ascribed meaning and of being defamatory.

¶37    We have also stated that to be defamatory, the "allegedly libelous statements must be aimed specifically at the person claiming injury." *McConkey*, ¶ 47; accord *Wainman*, 176 Mont. at 95–96, 576 P.2d at 270. We have interpreted this rule as requiring that "a plaintiff must show that people in the community other than the plaintiff perceived the statement to refer to the plaintiff . . . . [T]he test is neither the intent of the author nor the recognition of the plaintiff himself that the article is about him, but rather the reasonable understanding of the recipient of the communication." *Granger v. Time, Inc.*, 174 Mont. 42, 49–50, 568 P.2d 535, 540 (1977) (internal quotations omitted). Particularly relevant to the determination here is the single, common thread with which the articles begin. The articles state, in relevant part: "Friday evening **four individuals, allegedly from Shelby**, were caught vandalizing the new rest area just off the north exit off of I-15"; "It's been a month now since **four 'gentlemen' allegedly from Shelby**, and I use that with a great deal of sarcasm, stopped in at the new rest area just off of I-15"; and "**Two of four men**

19

**from Shelby** have been charged in the vandalism case at the new state-of-the-art rest stop just off of I-15. **Matthew Flesch**, age 21 . . . and **Robert Lee**, age 38." (Emphasis added.) Read together, I would find that a reader of the three articles could reasonably understand that the articles, as a whole, were aimed at Flesch and Lee. Further, we note that the absence of any reference to Hagman by name illustrates that the articles were not aimed specifically at him. I would find that the defamatory statements, viewed in the context of all three articles, were aimed specifically at Flesch and Lee, but not Hagman.2

¶38    The foregoing analysis must be interpreted in light of Article II, Section 7, of the Montana Constitution, which places the heart of any determination regarding defamatory libel directly within the province of the jury, subject only to determinations envisioned by the phrase "under the direction of the court." While we have held that "there is no absolute prohibition against summary judgment in libel cases," we emphasize that, due to the unique nature of cases involving libel, a district court should take particular care when evaluating such motions. *Hale*, ¶ 15. In my opinion, the circumstances here are remarkably similar to those in *Hale* where the plaintiff had been accused of being "most-wanted," a "fugitive," and "may be armed and dangerous." *Hale*, ¶ 23. This Court determined that "[i]t is apparent from the record that the evidence is not so overwhelming that the statements were 'essentially truthful,' so as to preclude a jury from determining otherwise." *Hale*, ¶ 21. The record contained evidence that Hale was neither a "most-

---

2  Our precedent also requires that if we determine the publication is defamatory, we must consider whether the publication is privileged. *See McLeod v. State*, 2009 MT 130, ¶ 21, 350 Mont. 285, 206 P.3d 956 (citing *Hale*, ¶ 35). However, the purpose of my dissent is to address the Court's usurpation of the jury's role in this defamation proceeding and not to discuss any privilege in making the defamatory statement.

wanted" suspect, nor a "fugitive" from justice; and thus the answer to the question of whether the information provided to the defendants was truthful was "far from conclusive." *Hale*, ¶ 20.

¶39 I dissent from the Court's decision to decide an issue of fact—truthfulness of the statements—which should have been submitted to the jury. I also disagree with this Court's departure from well-reasoned and careful precedent which recognizes a structured analysis and procedure for protecting the distinct roles of the judge and jury in defamation proceedings.

/S/ LAURIE McKINNON