04-636

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 418

MARK ALAN DENKE, Personal Representative
of the Estate of Kathlyn N. Denke, Deceased,

Petitioner and Appellant,

v.

MAURICE SHOEMAKER, Councilman for the
City of Thompson Falls, CITY OF THOMPSON FALLS,
and the HUMAN RIGHTS COMMISSION
OF THE STATE OF MONTANA,

Respondents and Appellees.

APPEAL FROM:     District Court of the Twentieth Judicial District,
                 In and For the County of Sanders, Cause No. DV 2002-042
                 Honorable C. B. McNeil, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Ann L. Moderie, James A. Manley, Manley Law Firm, Polson, Montana

        For Appellees:

                Ted Hess-Homeier, Attorney at Law, Missoula, Montana

                                    Submitted on Briefs:  February 16, 2005

                                                Decided:  December 16, 2008

Filed:

        _____
                            Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Kathy Denke, a former employee of the City of Thompson Falls, Montana, filed two complaints with the Montana Department of Labor and Industry alleging that the City and Maurice Shoemaker, a member of the Thompson Falls City Council, had unlawfully retaliated against her. After a contested case hearing, the hearing examiner awarded judgment against Denke on her claims against the City and partial judgment in favor of Denke on her claims against Shoemaker. The Human Rights Commission affirmed the examiner's decision.

¶2 Denke then filed a petition for judicial review in the Twentieth Judicial District Court, Sanders County. In the course of the proceedings, Shoemaker filed a bankruptcy petition in the United States Bankruptcy Court for the District of Montana. As a result, the District Court stayed the proceedings as they relate to Shoemaker. The proceedings continued, however, with respect to the City; and the court ultimately denied Denke's petition on the same grounds relied on by the hearing examiner—namely, that the City is immune from suit and is not liable for Shoemaker's actionable retaliatory conduct.

¶3 Denke now appeals.[1] Having considered the issues and arguments presented, we hold that the District Court erred in its conclusions that the City is immune from suit and that the City is not liable for Shoemaker's actionable retaliatory conduct. We therefore reverse the District Court's order denying Denke's petition for judicial review and remand for further proceedings.

---

[1] During the pendency of this appeal, Mark Alan Denke was substituted as Personal Representative of the Estate of Kathlyn N. Denke, Deceased. However, the references in this Opinion to "Denke" are to Kathy, not Mark.

2

## BACKGROUND

¶4     As noted, the District Court did not rule on Denke's petition for judicial review insofar as it relates to Shoemaker. Thus, Denke's claims against Shoemaker are not at issue in this appeal. At the same time, however, Shoemaker's actions and the hearing examiner's rulings with respect to those actions are intertwined with Denke's claims against the City, and they provide essential context for the issues addressed herein. For that reason, the factual background of this case and the hearing examiner's decision are set forth below in comprehensive detail. But we express no view in this Opinion on the merits of Denke's petition for judicial review vis-à-vis Shoemaker, as that is a matter to be addressed by the District Court in the first instance.

## I.     The Events Leading up to Denke's Instant Human Rights Complaint

¶5     Denke began working for the City of Thompson Falls in the early 1980s. At all times pertinent to this case, her job title was "Town Clerk/Finance Officer." The mayor was her immediate supervisor, and her job duties included acting as city treasurer.

¶6     In 1998 and early 1999, the City hired a certified public accountant to examine the City's bookkeeping and records. The CPA identified several problems and recommended procedures to improve the City's financial recordkeeping. A number of City Council members worked with Denke and the CPA to remedy the problems; and by the spring of 1999, the CPA reported that the books were in good order. In addition, the City authorized the CPA to implement the recommended procedural changes, for which the CPA charged $50.00 per hour.

3

¶7 As a member of the City Council, Shoemaker received the CPA's report and participated in the decision to authorize the CPA's work. Yet, despite the explanations provided by the CPA, Shoemaker (who had no accounting expertise) thought that Denke was responsible for causing the City to incur the expense of implementing the new recordkeeping procedures. He also believed that the City Council had tabled too many agenda items, particularly involving reports about ongoing City business, and that Denke was responsible for failing to provide completed reports and sufficient information to address the items the City Council had tabled.

¶8 In August 1999, Denke filed a Human Rights complaint with the Department of Labor and Industry alleging sexual harassment and retaliation by the mayor. In October of that year, the City Council met in executive session, which was open to the public, and agreed to settle this complaint and Denke's companion federal complaint filed with the Equal Employment Opportunity Commission. Shoemaker objected to the settlement on several grounds. He questioned the merits of Denke's claim, opining that it was filed in response to criticisms of her job performance rather than legitimately inappropriate treatment. He also expressed disagreement with the laws providing remedies for sexual harassment, and he resented the notion of a state agency investigating the City's conduct and interfering with the City's autonomy in resolving something that, in Shoemaker's view, was purely a local matter. Nevertheless, despite his objections, Shoemaker voted to approve the settlement. The parties then submitted the settlement agreement to the Human Rights Bureau of the Department of Labor and Industry for approval.

¶9 As part of the proposed settlement, the parties agreed not to discuss its terms with anyone. In addition, the mayor, the city attorney, and the members of the City Council (including Shoemaker) signed a separate document, which stated:

> The undersigned acknowledge, pursuant to Montana Law, that they shall not discriminate against or retaliate against Kathy Denke, Town Clerk for the City of Thompson Falls, as a result of her filing a discrimination complaint against the City and it's [sic] personnel.

¶10 In December 1999, Shoemaker received some questions and comments from citizens concerning the settlement of Denke's complaint. In addition, he heard a rumor that the City had paid $15,000.00 to settle the case, though the terms of the settlement agreement he had voted to approve did not include any such payment. Shoemaker felt defensive as a result of the public comments and speculation, and he worried that his constituents might blame him for an excessive settlement. Thus, he decided to respond publicly. To that end, Shoemaker requested that the mayor put him on the agenda for the next City Council meeting. The mayor did not do so.

¶11 Shoemaker then wrote a letter (dated January 6, 2000) to the local newspaper, the Sanders County *Ledger*, in which he purported to tell "the rest of the story." He noted that the mayor had refused his request to be put on the agenda, and he stated that there were "things going on at city hall that the public should know about." He contended that the *Ledger*'s editor and co-owner, Tom Eggensperger, who was also a member of the City Council, never printed any "negative city business," perhaps due to "some kind of conflict of interest." Of particular relevance to the case at hand, Shoemaker also asserted:

> The city had an audit in 1998 which shows there was poor bookkeeping at city hall. In fact it was so bad it is now costing the city $50.00 per hour to

5

get it corrected. This money was actually wasted, as the bookkeeping is already paid for. Maybe this is money that could have been used on city streets. This is your tax dollar.

. . .

And now to top everything off the city clerk filed sexual harassment charges against the Mayor and the city. This is why I wanted on the agenda, to talk about this with all parties present. I feel that as I represent the city that I have been accused of something that I had nothing to do with and should have a right to speak out publicly in my defense.

So far I have heard a "He did" but I have not heard a "I did not."

Shoemaker called for the mayor's "immediate resignation" and also suggested that "the Clerk [i.e., Denke] should take a long hard look and also resign." He signed the letter: "Maurice Shoemaker, Council Person Ward #1."

¶12 Eggensperger printed Shoemaker's letter, except for the three paragraphs quoted above, and attributed it to "Maurice Shoemaker, Councilperson Ward 1, Thompson Falls." Eggensperger also printed a response to Shoemaker's conflict-of-interest allegations, as well as the following explanation for not printing Shoemaker's letter in its entirety: "Mr. Shoemaker's letter was edited considerably as we felt he made accusations that were either unfair, unsubstantiated, a misrepresentation of the facts or inappropriate given his position on the council."

¶13 Unhappy about the editorial comments and deletions, Shoemaker made copies of his original letter available to citizens. He also read the deleted paragraphs to persons who called him and inquired about the letter and editorial comments. Then, on January 19, 2000, Shoemaker wrote a second letter to the *Ledger*. He accused Eggensperger again of "biased" reporting and having a conflict of interest. He repeated his complaint

about not being put on the agenda and insinuated that the mayor may have "something to hide." He also articulated the following "REASON I WANTED ON THE AGENDA":

> The city clerk filed a sexual harassment charge against the MAYOR and the city. At this time has there been a settlement or a pay off? If so whow [sic] and how much? Who got the money, the clerk and the MAYOR or what happened? I do not know as nothing has been told to me. Some one seems to want to sweep this under the carpet and not let the public know about it.
>
> It is for this reason that I believe the MAYOR should resign.
>
> It is for this and various other reasons that I believe that the clerk should also resign.

Shoemaker noted that he was "writing this as a concerned citizen of Thompson Falls."

¶14     It does not appear that Shoemaker's second letter was published in the *Ledger*, but he did provide copies of the letter to a number of citizens, including Laurie Brass. On or about January 24, 2000, Brass and others who had learned of Shoemaker's actions and views started circulating petitions calling for the mayor to place Shoemaker on the agenda for the February 14 council meeting "to talk about the sexual harassment charges filed against the mayor and the city by the city clerk." A copy of one of the petitions, which is included in the record, contains twenty signatures and refers to a "second page."

¶15     Denke received hostile comments in person and by telephone as a result of Shoemaker's letters and the petitions. Meanwhile, Shoemaker learned on January 27 that the Human Rights Bureau had approved the settlement that the City Council (including Shoemaker) had reviewed and agreed to in October 1999. However, Shoemaker did not convey this information to the people who were circulating the petitions.

¶16     The first item on the agenda for the February 14, 2000 council meeting was titled "Human Rights Complaint -- Maurice Shoemaker/Laurie Brass." Due to the size of the anticipated crowd, the meeting convened at the Community Center building, which has a meeting room substantially larger than the City Council chambers. Approximately 75 people attended, including Denke, who feared that her absence would aggravate the situation and further jeopardize her reputation and her job.

¶17     At the commencement of the meeting, the mayor, who normally presided over council meetings, resigned and walked out. As a result, Linda McKahan, who was the senior council member present, assumed the duty of chairing the meeting. As described below, the discussion related to Denke's Human Rights complaint was prolonged, and much of the citizen participation at the meeting pertained to this subject. McKahan, who was not experienced in chairing a council meeting of this nature, did not know how appropriately to limit the discussion; so, she did not.

¶18     Shoemaker began with lengthy remarks about the *Ledger*'s alleged censorship and the mayor's refusal to put him on the previous agenda. He then discussed the rumors regarding the amount of the settlement of Denke's complaint, which were inconsistent with his understanding of the settlement agreement, and the absence of any confirmation during a council meeting that the settlement had been accepted. Shoemaker suggested repeatedly that council members were "sweeping it under the rug" and "keeping it behind closed doors." He commented that he had not heard an apology to date from either the mayor or Denke. He told the assembly that Denke had agreed with his account of what

8

happened between her and the mayor; however, when he turned to Denke and asked her to acknowledge her supposed agreement with him, Denke refused.

¶19 Following Shoemaker's remarks, numerous citizens, members of the council, and the city attorney spoke in a free-ranging discussion. In addition, Brass began circulating copies of documents she had obtained from the Human Rights Bureau's investigative file. The city attorney and some council members pointed out that the settlement agreement contained a confidentiality clause; but Shoemaker argued that because the October 1999 session (during which the council discussed the proposed settlement) had been open to the public, the matter was open for discussion at the present meeting.

¶20 Many of the citizen comments during the meeting were not per se attacks on Denke, but rather were critical and suspicious of how council and government business was conducted. Some citizens, however, did make comments suggesting that Denke had been a willing participant in the sexual harassment, while others insinuated or directly asserted that Denke had voluntarily engaged in sexual activity with the mayor at work during working hours. When the discussion lagged, council members asked if there were any other comments, prefatory to closing the discussion and moving on to the next agenda item. That inquiry repeatedly prompted additional comments.

¶21 Denke attended the entire council meeting, seated prominently in front of the crowd. Her attendance was not mandatory; but, as noted, she anticipated that there would be discussion regarding her Human Rights complaint and the settlement, and she did not want to be conspicuously absent. Subsequently, the *Missoulian* newspaper printed an extensive article reporting on the meeting and the public comments that had been made

9

during it. Radio stations in western Montana and as far away as Great Falls also broadcast reports about the meeting.

**II.    Denke's Instant Human Rights Complaint, and the Final Agency Decision**

¶22    On March 3, 2000, Denke filed two Human Rights complaints with the Montana Department of Labor and Industry, alleging that Shoemaker and the City had unlawfully retaliated against her for filing and prosecuting her 1999 sexual harassment and retaliation claims. The Department consolidated the two complaints.

¶23    Regarding Shoemaker, Denke alleged that the following actions were retaliatory: publishing or causing to be published false public statements about her job performance, the 1999 Human Rights complaint, and the settlement of that complaint; making public references to the settlement, contrary to the confidentiality provision in the settlement agreement; publicly calling for her resignation; circulating or encouraging the circulation of petitions to place Shoemaker on the February 14 council meeting agenda to discuss the complaint and the settlement; causing the mayor to place him on the agenda to discuss these matters; falsely stating that he did not know the terms of the settlement; stating at the February 14 council meeting that he had not yet heard an apology from Denke for her complaint; and making, soliciting, encouraging, or failing to limit false, defamatory, humiliating, and abusive comments to and about Denke during the council meeting.

¶24    As for the City, Denke alleged that the City, through the City Council, retaliated against her by making, soliciting, encouraging, or failing to limit false, defamatory, humiliating, and abusive comments to and about Denke during the February 14 council meeting. Denke also alleged that the City was liable for Shoemaker's unlawful actions.

¶25 Denke's complaint proceeded to a two-day contested case hearing in December 2000. Thereafter, on November 16, 2001, the hearing examiner entered a Final Agency Decision, which included detailed findings of fact, a legal opinion as to Shoemaker's and the City's respective liability, and a determination as to the amount of Denke's damages.

¶26 With regard to Shoemaker's January 6 letter, the examiner found as follows. Shoemaker had no informed source reporting that the bookkeeping problems in 1998 were Denke's fault; and while he believed Denke was responsible for those problems, Shoemaker "personally could not tell an asset from an angle iron under generally accepted accounting principles." Shoemaker also had no information to contradict the CPA's 1999 report that the City's books were in good order. Furthermore, Shoemaker's assertion that it was Denke's fault the City had to spend $50.00 per hour for the CPA to make changes in accounting procedures was made "with reckless disregard for the truth or falsity of the statement." Shoemaker included this statement in his letter in furtherance of his goal of getting on the council meeting agenda to discuss Denke's Human Rights complaint and because he disapproved of Denke for filing that complaint. According to the examiner, Shoemaker took this action "with retaliatory animus toward Denke."

¶27 As for the January 19 letter, the examiner entered the following findings. At the time he wrote this letter, Shoemaker knew the terms of the settlement, knew exactly who would receive money under the settlement, knew how much money was contemplated by the settlement, and knew or reasonably should have known that the settlement submitted to the Human Rights Bureau was exactly the settlement he had voted for. Furthermore, he wrote the letter, with the false statements it contained about his knowledge of the

11

settlement, because he wanted a chance to tell citizens during a council meeting that the City had not made a $15,000.00 settlement payment and to repeat his objections to sexual harassment liability law. The examiner found that Shoemaker's question about who received the settlement money contained a "deliberate suggestion" that Denke and the mayor had colluded to obtain a settlement from the City based on a meritless sexual harassment claim and then had split the proceeds. Shoemaker, however, had no factual basis for these insinuations; indeed, he made the statements "with knowledge of their provably false connotations." In short, Shoemaker wrote the letter in furtherance of his goal of getting on the council meeting agenda to discuss Denke's Human Rights complaint and the settlement, and he took this action "with retaliatory animus toward Denke."

¶28 The hearing examiner entered a number of findings concerning injuries suffered by Denke. In particular, before attending the February 14 council meeting, she suffered severe emotional distress upon learning of the publication of Shoemaker's letters and receiving hostile comments in the community triggered by those publications. As a result of the meeting and the associated publicity, she suffered physical, emotional, and mental harm, which in turn caused her to miss a substantial number of work days and wages for those days. She required hospitalization for suicidal ideation and inability to function. Her ability to cope with her physical and emotional problems and the stresses of everyday life was "seriously compromised." The examiner found that although much of the harm suffered by Denke resulted from the council meeting and the associated publicity, she suffered discrete severe emotional distress because of Shoemaker's letters—specifically,

12

his assertion that it was her fault the City had to spend $50.00 per hour for the CPA to implement changes in accounting procedures, and his insinuation that she and the mayor had colluded to obtain payment in settlement of a meritless sexual harassment claim.

¶29 Turning to the legal issues, the hearing examiner first determined that Denke had established a prima facie case of unlawful retaliation by both the City and Shoemaker. Specifically, she proved that she had engaged in an activity protected by the Human Rights Act—namely, filing and prosecuting her 1999 Human Rights complaint—and that Shoemaker and the City had subjected her to "significant adverse acts," including "coercion, intimidation and harassment." Moreover, because these adverse acts occurred while Denke's complaint was pending or within six months after its resolution, the examiner observed that Denke was entitled to a "disputable presumption of retaliatory motive." In addition, the examiner noted that Denke had presented direct evidence of Shoemaker's retaliatory motive—e.g., his efforts to get on the agenda to discuss the settlement of her complaint, his letters in which he wrote about the complaint and its merits, his criticisms of her job performance, his suggestion that she resign, and his discussion of these matters at the council meeting. This direct evidence, along with the disputable presumption, satisfied the requirement of a "causal connection" between the adverse acts and the protected activity.

¶30 The hearing examiner then considered several affirmative defenses asserted by Shoemaker and the City: privilege under § 27-1-804, MCA; legislative immunity under § 2-9-111, MCA; and the constitutional right to free speech. At the outset, the examiner observed that the significant adverse acts established by Denke consisted of or related to

13

speech. The examiner thus characterized this case as involving a "conflict" between the right to free speech on one hand and the right to be free from illegal retaliation on the other. Noting that "there is little to no current Montana law defining the interaction between the Human Rights Act's prohibition against retaliation and these affirmative defenses," the examiner proceeded on the premise that "privileged, immune or constitutionally protected communications cannot be retaliatory."

¶31 Concerning Shoemaker's comments at the February 14 council meeting, the examiner decided that § 27-1-804(2), MCA, applied. This provision includes within the definition of "privileged publication" one that is made "in any legislative or judicial proceeding or in any other official proceeding authorized by law." Section 27-1-804(2), MCA. As to Shoemaker's letters, the examiner determined as follows: the statutory privilege did not apply because the letters were not published "in the proper discharge of an official duty" or "in any legislative or judicial proceeding or in any other official proceeding authorized by law," § 27-1-804(1), (2), MCA; statutory immunity did not apply because publishing the letters did not constitute "the lawful discharge of an official duty associated with legislative acts of the legislative body," § 2-9-111(3), MCA; but the constitutional free speech protections articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964), and its progeny did apply, except to the statements made with reckless disregard for their truth or falsity in the January 6 letter that Denke had engaged in poor bookkeeping and thus caused the City to spend $50.00 per hour for a CPA to correct the problem, and except to the provably false suggestion in the January 19 letter that Denke had colluded with the mayor to obtain payment from the City to settle a

14

meritless sexual harassment claim. The examiner concluded that Shoemaker had illegally retaliated against Denke when he circulated these statements and innuendos in his letters, and the examiner awarded Denke $7,500.00 to rectify the severe emotional distress she had suffered as a result of Shoemaker's illegal discriminatory actions. The examiner also imposed injunctive relief pursuant to § 49-2-506(1), MCA.

¶32    As for the City, the examiner determined that the comments made during the February 14 council meeting related to Denke's job performance and her Human Rights complaint were privileged under § 27-1-804(2), MCA, and that the City, therefore, could not be held liable for those comments. The examiner further determined, though with no supporting analysis, that "[t]here is neither law nor fact upon which to base a ruling that the city was responsible for Shoemaker's acts in writing the letters." The examiner thus concluded that "the city is not responsible for his retaliatory conduct."

¶33    Lastly, as to the "regulation" of the council meeting, the examiner first observed that "Shoemaker and some of his supporters made comments that confirmed they viewed sexual harassment as an improper subject for government regulation," and "some of the comments were premised upon the theory that any victim of sexual harassment was responsible for the harassment by encouraging or colluding in the inappropriate sexual overtures or behavior of the harasser." But, the examiner reasoned, however "repugnant" such comments may be, "disagreement with the law is an appropriate subject for comment during a city council meeting regarding settlement of a claim under that law." Furthermore, the examiner opined that while "the council could have limited these comments, in terms of time or topic," "whether and how to limit comment during a

15

council meeting is a legislative act." Thus, the examiner decided that the conduct of McKahan, the other council members, and the city attorney in allowing an unlimited public discussion of the Denke-related agenda item during the February 14 council meeting "consisted of the discharge of official duties associated with the council's legislative acts," for which the City is immune from suit under § 2-9-111, MCA.

¶34 In short, the hearing examiner ruled that the City "did not illegally retaliate against Denke, since its actions complained of were protected speech or immune legislative acts," and the City "was not responsible for Shoemaker's illegal retaliation." The examiner accordingly dismissed Denke's charges of discrimination against the City.

¶35 Denke then appealed to the Human Rights Commission ("HRC") the denial of her claim that Shoemaker and the City had retaliated against her during the February 14 council meeting and the denial of her claim that the City was liable for Shoemaker's unlawful retaliatory actions. The HRC affirmed the hearing examiner's Final Agency Decision in all respects. We note, in addition, that Shoemaker filed a cross-appeal in the HRC, which the HRC dismissed on procedural grounds. We affirmed that dismissal in *Shoemaker v. Denke*, 2004 MT 11, 319 Mont. 238, 84 P.3d 4.

### III. Denke's Petition for Judicial Review, and the District Court's Decision

¶36 Pursuant to § 2-4-702, MCA, Denke filed a petition for judicial review in the District Court on May 23, 2002. Shoemaker filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the District of Montana in February 2003, and the District Court accordingly stayed the proceedings on Denke's petition insofar as it relates to Shoemaker. Thus, we do not address Denke's claims against Shoemaker. As for her

16

claims against the City, Denke contended that the HRC erred in two respects: first, in its conclusion that the City is immune from suit for its allegedly retaliatory conduct, and second, in its conclusion that the City is not liable for the acts Shoemaker performed within the scope of his employment or agency.

¶37 The District Court disagreed with Denke's contentions. The court observed that § 2-9-111, MCA, grants governmental entities immunity for legislative acts, and the court decided that "the conducting of a city council meeting by the city is a legislative act." Next, the court concluded that under § 27-1-804, MCA, the City is not liable for the comments made by persons at the February 14 council meeting. The court also cited § 27-1-804, MCA, for the proposition that the City is not liable for Shoemaker's letters, though this contradicts the determination by the hearing examiner and the HRC that the statutory privilege does not apply to Shoemaker's letters. Lastly, the court held that Shoemaker "was not acting within the scope of his duties as a councilperson when he wrote the defamatory letters to the editors" and that the City, therefore, was not liable for this conduct. The court accordingly denied Denke's petition for judicial review insofar as it applies to the City of Thompson Falls. Denke now appeals.

## ISSUES

¶38 Denke raises the following issues on appeal:

1. Is the City immune from suit on Denke's retaliation claim against it?

2. Is the District Court's order denying Denke's petition for judicial review overbroad?

3. Is the City liable for Shoemaker's actionable retaliatory conduct?

17

¶39 The standards for reviewing a final decision of the HRC are whether the agency's findings of fact are clearly erroneous and whether the agency's interpretation and application of law are correct. Section 2-4-704(2)(a), MCA; *CEnTech Corp. v. Sprow*, 2006 MT 27, ¶ 20, 331 Mont. 98, ¶ 20, 128 P.3d 1036, ¶ 20; *O'Neill v. Dept. of Revenue*, 2002 MT 130, ¶ 10, 310 Mont. 148, ¶ 10, 49 P.3d 43, ¶ 10. A factual finding is clearly erroneous if it is not supported by substantial evidence in the record, if the fact-finder misapprehended the effect of the evidence, or if a review of the record leaves the court with a definite and firm conviction that a mistake has been made. *See Benjamin v. Anderson*, 2005 MT 123, ¶ 31, 327 Mont. 173, ¶ 31, 112 P.3d 1039, ¶ 31; *In re Montana All-Alcoholic Beverages Resort License*, 2008 MT 165, ¶ 26, 343 Mont. 331, ¶ 26, 184 P.3d 324, ¶ 26. This Court employs these same standards when reviewing the district court's order affirming or reversing the HRC's decision. *CEnTech*, ¶ 20; *O'Neill*, ¶ 10.

**DISCUSSION**

¶40 *Issue 1. Is the City immune from suit on Denke's retaliation claim against it?*

**I.     Clarification of the Issue**

¶41 Denke filed the instant Human Rights action claiming that the City had unlawfully retaliated against her in the way it "regulated" the February 14 council meeting. Denke's theory is that "moving the meeting place to accommodate the expected large crowd and allowing unlimited discussion . . . of Denke's sexual harassment complaint, that included personal attacks on Denke," constituted unlawful retaliation. She points out, based on testimony at the contested case hearing, that the City Council imposed limits on

discussions at other council meetings. In one particular instance, the City Council was considering a complaint against a law enforcement officer, and the mayor limited the speakers' comments to what they personally knew (as opposed to hearsay). In another instance, in order to receive as many comments from the public as possible concerning a water issue, a time limit of three minutes per speaker was imposed. In Denke's view, the City treated her differently by not imposing these same sorts of limitations on the discussion at the February 14 council meeting and by "actually encourag[ing] further, unlimited comment." The City did so, according to Denke, in retaliation for her filing and prosecuting her 1999 Human Rights complaint.

¶42 As noted in the background discussion above, the hearing examiner did not reach the question of whether the manner in which the City conducted the council meeting constituted unlawful retaliation. The examiner did determine that (1) "Denke presented evidence that . . . the city subjected her to coercion, intimidation and harassment" and (2) "All of the conduct at issue in this case occurred while Denke's prior complaint against the city was pending or within six months after its resolution. Thus, she is entitled to the disputable presumption of retaliatory motive." However, the examiner did not address whether the City had overcome this presumption. Rather, the examiner reasoned that (1) "the council could have limited [comments made during the meeting], in terms of time or topic," but (2) "whether and how to limit comment during a council meeting is a legislative act." The examiner concluded that for such legislative acts, the City is immune from suit under § 2-9-111, MCA, and, having reached this conclusion,

19

decided that "no further analysis is necessary" regarding the manner in which the City conducted the meeting.

¶43 In short, the hearing examiner essentially concluded that whether or not the City's challenged conduct was unlawful under the Human Rights Act, the City is immune from suit for that conduct and Denke's retaliation claim, therefore, must be dismissed. The HRC and the District Court both affirmed this conclusion based on the same rationale. Thus, in light of this procedural posture of the case, the question of whether the City's conduct of the council meeting actually amounted to unlawful retaliation is not before us, and we accordingly express no view on that question. Rather, the specific issue here is whether the examiner (and the HRC and the District Court) erred in determining that decisions regarding how to conduct a city council meeting are, in all instances, "legislative acts" for which the City is immune under § 2-9-111, MCA.

¶44 Denke contends that the hearing examiner erred in applying § 2-9-111, MCA, to the case at hand. She points out that in *Dagel v. City of Great Falls*, 250 Mont. 224, 819 P.2d 186 (1991), this Court held that "harassment by a supervisor" is not a "legislative act" under § 2-9-111, MCA. *See Dagel*, 250 Mont. at 233, 819 P.2d at 191. Denke argues that "[j]ust as harassment is not considered a 'legislative act' under the statute, neither should retaliation be so considered." In addition, relying in large part on *Bechard v. Rappold*, 287 F.3d 827 (9th Cir. 2002), Denke argues that "the City's regulation of the meeting was more administrative in nature than legislative." *See* § 2-9-111(1)(c)(ii), MCA (stating that "the term legislative act does not include administrative actions undertaken in the execution of a law or public policy").

20

¶45    The City disagrees and, also relying on *Bechard*, presents an argument that "the decision to use a larger building to accommodate greater attendance and the decision to allow and not restrict public comment" were immune legislative acts.  Wholly aside from this immunity argument, however, the City also renews its free speech and statutory privilege defenses.   Specifically, the City argues that it cannot be held liable for statements made during the February 14 council meeting because those statements were privileged under § 27-1-804, MCA, and were protected by the constitutional free speech principles articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964).  Along these same lines, the City also contends that it could not lawfully have regulated what was said at the meeting.   These arguments appear to be offered as alternative grounds for concluding that the City cannot be held liable to Denke for its conduct of the meeting and, therefore, for upholding the District Court's order denying her petition for judicial review.  *See e.g. Peterson v. Eichhorn*, 2008 MT 250, ¶ 21, 344 Mont. 540, ¶ 21, 189 P.3d 615, ¶ 21 ("We uphold a district court's judgment if the court reaches the correct result, regardless of the court's reasoning.").

¶46    For the reasons which follow, we agree with Denke that the hearing examiner, the HRC, and the District Court erred in their respective applications of § 2-9-111, MCA, to the case at hand.  Furthermore, we conclude that the City's reliance on § 27-1-804, MCA, and *New York Times* is misplaced.  However, we do agree, in part, with the City's argument that it could not lawfully have regulated what was said at the council meeting.  Because our partial agreement with the City's regulation argument may limit Denke's entitlement to relief, it is useful to address that argument first, followed by a discussion of

21

the immunity issue. Lastly, we address the City's alternative theories based on statutory privilege and *New York Times*.

## II. The City's Regulation Argument

¶47  The City contends that there are "legal limits" on the City Council's "ability to restrict speech" at a council meeting. We agree. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 828, 115 S. Ct. 2510, 2516 (1995). Nor may government, in the realm of private speech or expression, favor one speaker over another. *Rosenberger*, 515 U.S. at 828, 115 S. Ct. at 2516. Indeed, viewpoint discrimination is "an egregious form of content discrimination," and the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829, 115 S. Ct. at 2516. These well-settled principles are mandated not only by the First Amendment to the United States Constitution, but also by Article II, Section 7 of the Montana Constitution.

¶48  It follows from these principles that when the government opens a forum for discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on that subject. *See Dorn v. Board of Trustees*, 203 Mont. 136, 146, 661 P.2d 426, 431 (1983); *Rosenberger*, 515 U.S. at 829, 115 S. Ct. at 2516; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 61, 103 S. Ct. 948, 964 (1983) (Brennan, Marshall, Powell, & Stevens, JJ., dissenting). Accordingly, to the extent Denke complains that the City Council should have regulated or otherwise controlled the

particular viewpoints expressed by speakers related to her 1999 Human Rights complaint during the February 14 council meeting, her claim must fail. *See City of Madison, Joint School Dist. No. 8 v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 176, 97 S. Ct. 421, 426 (1976) ("Whatever its duties as an employer, when the board sits in public meetings to conduct public business and hear the views of citizens, it may not be required to discriminate between speakers on the basis of . . . the content of their speech.").

¶49     We do not agree, however, with the City's suggestion that it is powerless to impose any restrictions at all on discussions at council meetings. For one thing, the hearing examiner stated that "the council could have limited [comments made during the meeting], in terms of time or topic," and the City has neither cross-appealed from nor challenged this portion of the examiner's decision at any point during the course of this litigation. Moreover, while the City argues at some length that content-based restrictions on speech are not permitted, the City concedes in a footnote that "reasonable time and place restrictions are probably permitted."

¶50     In any event, the law in this area is well-settled, and it clearly supports the hearing examiner's statement. Time, place, and manner restrictions that preserve a city council's legitimate interest in conducting efficient and orderly meetings are permissible, so long as the restrictions are reasonable and viewpoint neutral. *See e.g. City of Madison*, 429 U.S. at 175 n. 8, 97 S. Ct. at 426 n. 8 (speech may be confined to the specified topic at hand); *White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir. 1990) (same); *Rowe v. City of Cocoa*, 358 F.3d 800, 803 (11th Cir. 2004) (same); *Wright v. Anthony*, 733 F.2d

23

575, 577 (8th Cir. 1984) (upholding a five-minute limit on each speaker); *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir. 1995) (three-minute limit); *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007) (three-minute limit); *Jones v. Heyman*, 888 F.2d 1328, 1329, 1333 (11th Cir. 1989) (holding that a truculent speaker may be restricted or even removed); *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 281 (3d Cir. 2004) (same).

¶51    While we conclude that reasonable and viewpoint-neutral limitations on speech at a council meeting may be imposed, we by no means retreat from " 'the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' " *Skinner v. Pistoria*, 194 Mont. 257, 261, 633 P.2d 672, 674-75 (1981) (quoting *New York Times*, 376 U.S. at 270, 84 S. Ct. at 721).   As we stated in *Skinner*, "[t]he concern which all citizens have in the proper conduct of public affairs by public officials requires that there be wide freedom to criticize that conduct, even though the criticism be unjustified or extravagant." *Skinner*, 194 Mont. at 262, 633 P.2d at 675. We reaffirm these views.   At the same time, however, we conclude that imposition of reasonable and viewpoint-neutral time, place, and manner restrictions at a city council meeting will not unduly hamper debate on public issues or criticism of the conduct of public affairs.

¶52    In sum, we agree with the City that it could not lawfully have regulated the particular viewpoints expressed by speakers related to Denke's 1999 Human Rights complaint during the February 14 council meeting.  We also conclude that the City may

impose reasonable and viewpoint-neutral time, place, and manner restrictions on speech for the purpose of conducting its council meetings in an efficient and orderly manner. In so holding, we caution that failing to impose such restrictions does not necessarily constitute unlawful retaliation. That question depends on the laws defining and prohibiting unlawful retaliation; and with respect to the February 14 council meeting, the hearing examiner must complete the retaliation analysis in the first instance on remand.

## III. The Immunity Issue

¶53 We next address whether the City is immune from suit for its conduct of the council meeting with regard to the Denke-related agenda item. Given our holding above in Section II, the City could not have regulated the particular viewpoints expressed by speakers on this topic, but it could have imposed reasonable and viewpoint-neutral time, place, and manner restrictions on the discussion. Accordingly, the immunity issue here relates only to Denke's complaint that the City failed to impose such restrictions.

¶54 Montana's 1972 Constitution abolishes the common-law doctrine of sovereign immunity from suit. *See* Mont. Const. art, II, § 18; *Silvestrone v. Park County*, 2007 MT 261, ¶ 12, 339 Mont. 299, ¶ 12, 170 P.3d 950, ¶ 12. At the same time, however, the Constitution provides that immunity may be established by specific provision enacted by a supermajority of both houses of the Legislature. Specifically, Article II, Section 18 states: "The state, counties, cities, towns, and all other local governmental entities shall have no immunity from suit for injury to a person or property, except as may be specifically provided by law by a 2/3 vote of each house of the legislature." Thus, governmental immunity exists in this state only as provided by statutes enacted by a two-

thirds vote of both houses. *See e.g. Whiting v. State*, 248 Mont. 207, 221-22, 810 P.2d 1177, 1186 (1991). Section 2-9-111, MCA, is such a statute. Likewise, although not addressed by the hearing examiner, the HRC, or the District Court, the City also cites § 2-9-114, MCA, which was enacted pursuant to Article II, Section 18's exception. These provisions establish governmental immunity from suit for the acts and omissions enumerated therein.

¶55 Application of the sovereign immunity defense does not mean that there is an absence of duty to the plaintiff; rather, where the immunity defense exists, the breach of duty is simply not actionable against the sovereign. *Orr v. State*, 2004 MT 354, ¶ 55, 324 Mont. 391, ¶ 55, 106 P.3d 100, ¶ 55. Thus, although the government may fail in its duty or obligation to the plaintiff, it is not subject to suit for such conduct if the conduct falls within the statutory grant of immunity. Perhaps recognizing the severity of this result, we have said that "it is 'our duty to strictly construe any attempted governmental immunity -- that is, every act expanding statutory immunity must be clearly expressed.' " *Mitchell v. Univ. of Montana*, 240 Mont. 261, 265, 783 P.2d 1337, 1339-40 (1989) (quoting *B.M. v. State*, 200 Mont. 58, 62, 649 P.2d 425, 427 (1982)). Consistent therewith, our approach has been to limit governmental immunity to that which is granted by the plain wording of the immunity statutes. *See e.g. Mitchell*, 240 Mont. at 263-65, 783 P.2d at 1339-40; *Montana Vending, Inc. v. Coca-Cola Bottling Co.*, 2003 MT 282, ¶¶ 17-18, 318 Mont. 1, ¶¶ 17-18, 78 P.3d 499, ¶¶ 17-18. Accordingly, in the case at hand, we must strictly construe the grants of immunity in §§ 2-9-111 and -114, MCA, in determining whether they include the conduct alleged to give rise to Denke's claim.

¶56 Section 2-9-111(2), MCA, provides that "[a] governmental entity is immune from suit for a legislative act or omission by its legislative body, or any member or staff of the legislative body, engaged in legislative acts." The term "governmental entity" includes municipalities. Section 2-9-111(1)(a), MCA. Furthermore, the term "legislative act," as applicable in the case at hand, means "actions by a legislative body that result in creation of law or declaration of public policy." Section 2-9-111(1)(c)(i)(A), MCA. The hearing examiner opined that "whether and how to limit comment during a council meeting is a legislative act." Similarly, the District Court expressed the view that "the conducting of a city council meeting by the city is a legislative act." These statements are correct in the sense that conducting a city council meeting and placing (or failing to place) limits on the discussion of a particular agenda item at the meeting are actions taken by a legislative body. However, such actions here, which did not "result in creation of law or declaration of public policy," do not fall within the plain wording of the term "legislative act" as defined in § 2-9-111(1)(c)(i)(A), MCA. Accordingly, strictly construing the grant of governmental immunity as provided by the plain wording of this statute, we hold that the City's conduct of the discussion of the Denke-related agenda item is not encompassed within that statutory grant.

¶57 Section 2-9-114, MCA, provides that "[a] local governmental entity and the elected executive officer thereof are immune from suit for damages arising from the lawful discharge of an official duty associated with vetoing or approving ordinances or other legislative acts or in calling sessions of the legislative body." Here, there were no ordinances under consideration during the discussion of the Denke-related agenda item,

27

and neither that discussion nor the regulation thereof involved legislative acts. However, the statute grants immunity for the lawful discharge of an official duty "in calling sessions of the legislative body." Although Denke's claim appears to rest on the manner in which the council meeting was *conducted*, for which the City is not immune from suit under § 2-9-114, MCA, we note that to the extent Denke's claim rests on the "calling" of the meeting itself, the City is immune under § 2-9-114, MCA, for that particular act.

¶58 Given the foregoing conclusions, we need not address the parties' dispute over whether decisions regarding how to conduct the February 14 council meeting were "legislative acts" under the test articulated in *Bechard*. We hold that the City cannot prevail in asserting either § 2-9-111, MCA, or § 2-9-114, MCA, as a defense to Denke's claim of unlawful retaliation based on the City's conduct of the discussion of the Denke-related agenda item at the council meeting. We accordingly reverse the District Court's determination that the City is immune from suit.

## IV. The City's Statutory Privilege and *New York Times* Arguments

¶59 The City contends that the statements made at the February 14 council meeting were privileged and constitutionally protected and that the City, therefore, cannot be held liable for those statements. In this connection, the City relies on *Skinner v. Pistoria*, 194 Mont. 257, 633 P.2d 672 (1981), the statutory privilege contained in § 27-1-804, MCA, and *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710 (1964).

¶60 *Skinner* was a defamation action that arose out of statements made by Pistoria at a meeting of the Great Falls City Commission during the time reserved for public comment. Pistoria's statements included an accusation that Skinner and other police

28

officers had misused police department funds. Skinner claimed that these statements were made with a malicious personal motive and that they exposed him to hatred, contempt, ridicule, and obloquy, caused him to be shunned and avoided, and injured him in his occupation. *See Skinner*, 194 Mont. at 259-61, 633 P.2d at 673-74. This Court held, however, that § 27-1-804(2), MCA, confers an absolute privilege on publications made in an "official proceeding authorized by law," so long as the publications are made "to the proper authorities responsible for the interest being expressed." *Skinner*, 194 Mont. at 263, 633 P.2d at 676. Thus, if Pistoria's statements about the conduct of certain police officers were made at a proper proceeding, then the question of whether the statements were maliciously motivated was irrelevant. *Skinner*, 194 Mont. at 263, 633 P.2d at 676. We concluded that the absolute privilege applied to Pistoria's statements for the following reasons: the meeting was an official meeting authorized by law; it was proper for Pistoria to address the commission because it was the governing body of the city; it was proper for him to address the city manager because the manager supervises the police department; and it was proper for him to address the chief of police because the police chief supervises all city police officers. *Skinner*, 194 Mont. at 264, 633 P.2d at 676.

¶61 The City contends that the similarity between *Skinner* and the case at hand is "startling" and that *Skinner* "glaringly" supports the conclusion that the statements and comments made at the February 14 council meeting were privileged. The City also cites *New York Times* for the proposition that "our free citizenry has the right to criticize its public officials," even with "obnoxious comments." The City avers that the *New York*

29

*Times* decision disdains any attempts "to stifle critique of public officials" and that speech is constitutionally protected even if it is "untrue, useless and very offensive." Thus, on the assumption that Denke was a "public official" as contemplated by *New York Times*, the City maintains that her complaint about "retaliatory speech" was properly dismissed.

¶62    We conclude that the City's reliance on *Skinner*, § 27-1-804, MCA, and *New York Times* is misplaced. *Skinner* was a defamation suit against an individual who spoke at a Great Falls City Commission meeting. The instant action, however, is not a defamation suit. Nor is it against anyone who spoke at the February 14 council meeting (aside from Shoemaker, whose liability is not at issue in this appeal). And we do not perceive in Denke's arguments any suggestion that the City should be held liable for statements made by anyone at the meeting other than Shoemaker. Denke does intimate at a couple of points in her opening brief that the City itself "defamed" her; however, as discussed above, this does not appear to be the substance of her claim against the City. And if it is one of her theories of liability, she offers no explanation or analysis of how the City "defamed" her, thus rendering the theory improperly presented for appellate review. *In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6.

¶63    For these reasons, *Skinner* and § 27-1-804, MCA, are inapt, and the same can be said of *New York Times*. Even if Denke, as a municipal Town Clerk/Finance Officer, qualifies as a "public official" or "public figure" under *New York Times* and its progeny the principles articulated in those cases respecting the intersection of constitutional free speech and defamation law are not at issue here.

## V. Conclusion

¶64    In sum, we hold that the City cannot prevail in asserting either § 2-9-111, MCA, or § 2-9-114, MCA, as a defense to Denke's claim of unlawful retaliation based on the City's conduct of the discussion of the Denke-related agenda item at the February 14 council meeting. As for the alternative defenses raised by the City, we conclude that § 27-1-804, MCA, and *New York Times* are inapplicable here; and while we agree with the City that it could not lawfully have regulated the particular viewpoints expressed by speakers related to Denke's 1999 Human Rights complaint, we disagree with the City's contention that it could not have imposed any restrictions on the discussion at all. We accordingly reverse the hearing examiner's, the HRC's, and the District Court's immunity determinations and remand this matter for further proceedings consistent with the foregoing discussion.

¶65    *Issue 2. Is the District Court's order denying Denke's petition for judicial review overbroad?*

¶66    Denke contends that the District Court's order denying her petition for judicial review is overbroad. The District Court held that the City was not liable for Shoemaker's letters because he "was not acting within the scope of his duties as a councilperson when he wrote the defamatory letters." In addition, however, the court also stated that the City "is not liable for Councilman Shoemaker's letters to the editor, or for comments made by those attending the council meeting *because of § 27-1-804, MCA protecting privileged communication and the Montana Supreme Court case of* Skinner vs. Pistoria*, 194 Mont. 257, 633 P.2d 672 (1981)*" (emphasis added). As Denke correctly points out, this latter

31

rationale not only is beyond the scope of the issues before the District Court, but also amounts to a sua sponte reversal of a final determination concerning Shoemaker's liability for his letters.

¶67 First, a ruling that the City is not liable for comments made "by those attending the council meeting" is overbroad, since Denke has not sought to hold the City liable for the comments of anyone except Shoemaker. Second, the proceedings in the District Court related to Shoemaker were stayed by virtue of his filing a bankruptcy petition. As a result, a ruling that Shoemaker's comments at the council meeting were privileged under § 27-1-804, MCA, is premature. Third, the hearing examiner determined that § 27-1-804, MCA, did *not* apply to Shoemaker's letters. As explained above, Shoemaker forfeited his appeal of this determination. *See Shoemaker v. Denke*, 2004 MT 11, 319 Mont. 238, 84 P.3d 4. Thus, the District Court was not in a position to enter a contrary ruling that his letters *were* privileged under § 27-1-804, MCA.

¶68 For these reasons, it is necessary to vacate the District Court's statement in its Order Denying Petition for Judicial Review that "the Respondent city of Thompson Falls is not liable for Councilman Shoemaker's letters to the editor, or for comments made by those attending the council meeting because of § 27-1-804, MCA protecting privileged communication and the Montana Supreme Court case of *Skinner vs. Pistoria*, 194 Mont. 257, 633 P.2d 672 (1981)." If and when the bankruptcy stay is lifted, the District Court may then revisit the issue of whether Shoemaker's comments at the February 14 council meeting were privileged and, if necessary, the issue of whether the City is liable for those comments.

32

¶69    *Issue 3.  Is the City liable for Shoemaker's actionable retaliatory conduct?*

¶70    The hearing examiner determined that Shoemaker illegally retaliated against Denke when he circulated his January 6 and January 19 letters.  In particular, the examiner held Shoemaker liable for (1) the statements in the January 6 letter, made with reckless disregard for their truth or falsity, that it was Denke's fault the City had to spend $50.00 per hour for the CPA to implement changes in accounting procedures and (2) the provably false suggestion in the January 19 letter that Denke and the mayor both received payments from the City to settle her sexual harassment and retaliation claims against the mayor.  The examiner awarded Denke $7,500.00 for the severe emotional distress she suffered as a result of Shoemaker's illegal discriminatory actions.  As for Shoemaker's comments at the February 14 council meeting, however, the examiner decided those were privileged under § 27-1-804(2), MCA.  Thus, the examiner denied relief on this portion of Denke's complaint.

¶71    Denke contends that the City may be held liable for Shoemaker's "actionable" conduct.  It is necessary here to identify which conduct by Shoemaker presently qualifies as "actionable."  As noted, the HRC dismissed his cross-appeal on procedural grounds, and this Court affirmed that dismissal in *Shoemaker v. Denke*, 2004 MT 11, 319 Mont. 238, 84 P.3d 4.  As a result, there are no further determinations to be made with respect to Shoemaker's liability for the retaliatory statements and innuendos in his letters; the award of $7,500.00 in favor of Denke is final.  But with respect to Shoemaker's comments at the February 14 council meeting, Denke asserted in her petition for judicial review that the HRC erred in its conclusion that those comments were privileged under § 27-1-804,

33

MCA.  Due to the bankruptcy stay in the District Court, this issue has not yet been decided.  In other words, it remains to be determined by the District Court—and, if an appeal ensues, by this Court—whether Shoemaker is subject to liability for the comments he made related to Denke's 1999 Human Rights Complaint at the council meeting.

¶72    Accordingly, Denke appropriately limits her discussion under Issue 3 to the City's liability for Shoemaker's retaliatory statements and innuendos in his letters, and we do the same.  At this point in time, that is the only "actionable" conduct for which the City might be held liable.  We express no view on the City's liability for the comments made by Shoemaker at the February 14 council meeting, as it has not yet been determined, as a final matter, whether those statements are in fact "actionable."

¶73    Respondeat superior is a doctrine of the law of agency by which the consequences of one person's actions may be attributed to another person.  *Saucier v. McDonald's Restaurants of Montana, Inc.*, 2008 MT 63, ¶ 64, 342 Mont. 29, ¶ 64, 179 P.3d 481, ¶ 64.  Denke points out, and the City does not dispute, that an employer may be liable, on the basis of respondeat superior, for an illegal discriminatory act by its employee.  *See Vainio v. Brookshire*, 258 Mont. 273, 278-79, 852 P.2d 596, 600 (1993).

¶74    An employer is liable for the acts of an employee only when the employee is acting "within the scope of his or her duties to the employer."  *Bowyer v. Loftus*, 2008 MT 332, ¶ 8, 346 Mont. 182, ¶ 8, 194 P.3d 92, ¶ 8; *see also Kenyon v. Stillwater County*, 254 Mont. 142, 146, 835 P.2d 742, 745 (1992) ("Governmental entities in Montana are subject to liability for their own wrongful conduct and that of their employees acting within the scope of their duties." (citing § 2-9-102, MCA)).  Whether an act was within

the scope of employment is generally a question of fact; however, it is a question of law for the court when only one legal inference may reasonably be drawn from the facts. *Bowyer*, ¶ 8. Based on these principles, the relevant questions are (1) whether Shoemaker was an employee of the City in January 2000 and (2) whether his actions occurred within the scope of his employment.

¶75 With respect to the first question, Denke cites *Kenyon* and § 2-9-101(2), MCA (1999), for the proposition that Shoemaker was a City employee. Section 2-9-101(2), MCA, defines "employee" as "an officer, employee, or servant of a governmental entity, including elected or appointed officials, . . . ." In *Kenyon*, we held that for liability purposes under Montana statutes, "elected county officials are employees of the county." *Kenyon*, 254 Mont. at 146, 835 P.2d at 745 (citing § 2-9-101, MCA). Extending this holding to the case at hand, Denke asserts that elected city officials are employees of the city. The City concedes that Shoemaker was "employed" by the City in January 2000.

¶76 With respect to the second question, Denke proffers three reasons why Shoemaker was acting within the scope of his employment when he wrote the letters. First, Denke cites Shoemaker's testimony at the contested case hearing that he wrote both letters "as a private citizen and as a Thompson Falls council person." Second, Denke notes that Shoemaker signed the January 6 letter as "Maurice Shoemaker, Council Person Ward #1." Third, Denke contends that the City admitted this point in the course of the proceedings before the Department of Labor and Industry. In response, the City offers three arguments why respondeat superior liability should not apply here. We address those three arguments in turn.

35

¶77    First, citing *Vainio* and *E.E.O.C. v. Hacienda Hotel*, 881 F.2d 1504, 1515 (9th Cir. 1989), the City claims that respondeat superior applies in the discrimination context only if the discriminatory act was committed by the complainant's "supervisor."  Thus, the City contends, since Shoemaker was not Denke's supervisor, the City is not liable for his unlawful retaliatory conduct.  The cases cited by the City, however, do not support such a rule.  It is true that *Vainio* and *Hacienda Hotel* involved discrimination (specifically, sexual harassment) by a "supervisor," but neither case states that respondeat superior applies only to conduct by a "supervisor."  In fact, what we stated in *Vainio* was that "[a]ll that is needed to make [the employer] subject to the administrative proceeding is for [the employee] to allege that [the perpetrator], *an agent* of [the employer], committed unlawful sexual discrimination."  *Vainio*, 258 Mont. at 279, 852 P.2d at 600 (emphasis added).  This statement is consistent with the fact, noted above, that respondeat superior is a doctrine of the law of agency.  *Saucier*, ¶ 64.

¶78    Second, the City invokes Aristotle's *Logica* for the proposition:  "Something has to be *or* not be.  Something cannot both be *and* not be."[2]  Applying this principle here, the City argues that either Shoemaker was engaged in "legislative behavior" when he wrote the letters, in which case his statements were privileged under § 27-1-804, MCA, or he was not engaged in "legislative behavior" when he wrote the letters, in which case he was not acting within the scope of his employment.  "Either way," the City asserts, "Denke loses."  The City also posits that "Aristotle would have agreed with the HRC."

---

[2] Schrödinger's cat, who was both alive and dead until its box was opened, might dispute this contention.  *See* E. Schrödinger, *Die gegenwärtige Situation in der Quantenmechanik*, 23 Die Naturwissenschaften 807-12, 823-28, 844-49 (1935).

36

¶79     At first glance, the City's reasoning has some appeal.  Essentially, the City argues that if Shoemaker's letters were not published "in the proper discharge of an official duty" for purposes of § 27-1-804(1), MCA, as the hearing examiner found, then he could not have been acting "within the scope of his duties to the City" for purposes of respondeat superior liability.  The flaw in the City's reasoning, however, is the assumption that these two standards are equivalent.  They are not.  Unlawful retaliatory conduct does not qualify as "the proper discharge of an official duty" for purposes of § 27-1-804(1), MCA.  In contrast, the doctrine of respondeat superior is designed to hold an employer liable for the wrongful conduct of its employee.  The doctrine actually contemplates that wrongful conduct (such as unlawful retaliation) was committed within the scope of employment.  Accordingly, the fact that Shoemaker's retaliatory statements were not privileged under § 27-1-804(1), MCA, does not mean that the City cannot be held liable under the doctrine of respondeat superior for his making those statements—Aristotle's *Logica* notwithstanding.

¶80     Third, and lastly, the City simply denies that Shoemaker was acting within the scope of his employment when he wrote the letters.  The City claims that "Shoemaker is a legislator" and was not acting "within the scope of his employment as a legislator."  The City reasons that "Shoemaker wrote and sent the letters on his own time outside of any sort of Council meeting."  We agree with Denke, however, that the City's denials directly contradict the City's prior admissions.

¶81     In its brief in support of its motion for summary judgment filed in the Department of Labor and Industry, the City made a number of assertions concerning Shoemaker's

function in writing the January 2000 letters. First, the City explained that Shoemaker felt it was his "legislative duty" to provide a forum for the townspeople to discuss Denke's job performance and the settlement of her 1999 Human Rights complaint, and when the mayor initially refused his request to be put on the agenda, Shoemaker wrote the two letters out of frustration, which in turn prompted the mayor to provide Shoemaker the forum he had requested (a place on the council meeting agenda). Second, the City asserted that "[a]s a City Council Person, Shoemaker has a responsibility to his constituency to examine, debate and even verbally attack the Clerk if he disapproves of the clerk's job performance." Third, the City acknowledged that Shoemaker's letters "weren't written either in legislative chambers or during an actual legislative session," but the City argued that certain "actions by local government legislators are absolutely privileged," including Shoemaker's various statements in his letters.

¶82    In addition to these assertions, the City explicitly took the view that Shoemaker was acting as "a legislator" when he took his concerns about Denke to the press:

> The H.R.C. should also note that Shoemaker was forced to go to the press with his legislative concerns after Shoemaker was denied his right to air his concerns about Denke at a city council meeting. *H.R.C. Final Invest. Rep.* p. 7, para. 3. It's ironic that Shoemaker was denied access to the city council meeting by the perpetrator of the originally alleged sexual harassment. *Infra*. It's hard to imagine a state agency not recognizing, that in the United States of America, a legislator has both the moral obligation and the legally protected right to take his concerns about a public official to the press after being denied the right to air his concerns during a legislative session.

¶83    The City acknowledges these statements but contends they were made in support of "affirmative defenses." Yet, the City offers no insight whatsoever as to how this fact

bears on our analysis. We have held that a party or its attorney may make judicial admissions in a brief supporting a motion for summary judgment and that such an admission "has a conclusive effect upon the party who makes it, and prevents that party from introducing further evidence to prove, disprove, or contradict the admitted fact." *Bitterroot Int'l Systems, Ltd. v. Western Star Trucks, Inc.*, 2007 MT 48, ¶¶ 41-43, 336 Mont. 145, ¶¶ 41-43, 153 P.3d 627, ¶¶ 41-43. The City cites no authority for the proposition that the rules of judicial admissions do not apply to affirmative defenses.

¶84 Of course, to be binding a judicial admission must be "an unequivocal statement of fact." *In re Raymond W. George Trust*, 1999 MT 223, ¶ 37, 296 Mont. 56, ¶ 37, 986 P.2d 427, ¶ 37. Here, the City asserted in its brief, on more than one occasion, that Shoemaker was acting in his role as a "legislator" or "councilperson" when he wrote the January 2000 letters. The City referred to Shoemaker's "legislative duty" and "responsibility to his constituency" to provide a forum in which to "examine, debate and even verbally attack" Denke if he disapproved of her job performance. The City characterized Shoemaker's letter writing as a means to fulfill this duty/responsibility. Indeed, the City explicitly argued that "a legislator has both the moral obligation and the legally protected right to take his concerns about a public official to the press after being denied the right to air his concerns during a legislative session."

¶85 The City's assertions are confirmed by the actual language of Shoemaker's letters. Shoemaker signed the January 6 letter as "Maurice Shoemaker, Council Person Ward #1." In this letter, he purported to reveal information that he, as a councilperson, wanted the public to know, such as the fact that there were "things going on at city hall that the

39

public should know about." Shoemaker asserted that the *Ledger* never printed any of the "negative city business," and he stated: "Some of you will be surprised. Believe me, we do not have a perfect city government." Shoemaker explained that he was writing this letter because the mayor had refused to put him on the next council meeting agenda to discuss matters which "concerned the city and should be of interest to the public." Likewise, in his January 19 letter, Shoemaker indicated his desire to inform the public of what was going on at city hall, and he lamented the fact that the mayor had refused to put him on the agenda. Shoemaker stated: "I believe that what goes on at city hall should not be kept from the public." As noted, the City stated in its summary judgment brief that Shoemaker, as "a legislator," had "both the moral obligation and the legally protected right to take his concerns about a public official to the press after being denied the right to air his concerns during a legislative session."

¶86    We conclude that the City's statements constitute judicial admissions that Shoemaker was acting in his capacity as a councilperson when he wrote the January 2000 letters. We further conclude that these judicial admissions preclude the City from arguing now the diametrically opposite position that Shoemaker was *not* acting within the scope of his employment as a legislator when he wrote the letters.

¶87    Aside from the rules of judicial admissions, Denke also directs our attention to § 2-9-305, MCA (1999). Subsection (1) states that "[i]t is the purpose of this section to provide for the immunization, defense, and indemnification of public officers and employees civilly sued for their actions taken within the course and scope of their employment." Section 2-9-305(1), MCA. Subsection (5), in turn, provides that in an

action against a governmental entity based on the conduct of an employee, the employee is immune from liability if the governmental entity "acknowledges" that the employee's conduct arose "out of the course and scope of the employee's employment" (except in circumstances not relevant here). Section 2-9-305(5), MCA. This provision lends further support to our conclusion that the City's "acknowledgements" in its motion for summary judgment render the City liable for Shoemaker's conduct in circulating the unlawful retaliatory statements and innuendos in his letters.

¶88 In light of the City's admissions that Shoemaker was a City employee in January 2000 and was acting in his capacity as a councilperson when he wrote the letters, the City may be held liable under the doctrine of respondeat superior for this retaliatory conduct.

## CONCLUSION

¶89 We hold that the City cannot prevail in asserting § 2-9-111, MCA, or § 2-9-114, MCA, as a defense to Denke's claim of unlawful retaliation based on the City's conduct of the discussion of the Denke-related agenda item at the February 14 council meeting. We accordingly reverse the District Court's contrary conclusion and remand with instructions that the District Court order the hearing examiner to make a determination, in the first instance, as to whether the City's conduct of the February 14 council meeting constituted unlawful retaliation as alleged by Denke.

¶90 We further hold that the City is liable under the doctrine of respondeat superior for Shoemaker's illegal retaliation against Denke arising out of his January 2000 letters. We reverse the District Court's contrary conclusion and remand with instructions that the District Court enter judgment in favor of Denke on this claim.

41

¶91 In addition, for the reasons explained in Issue 2, we vacate the statement in the District Court's Order Denying Petition for Judicial Review that the City "is not liable for Councilman Shoemaker's letters to the editor, or for comments made by those attending the council meeting because of § 27-1-804, MCA protecting privileged communication and the Montana Supreme Court case of *Skinner vs. Pistoria*, 194 Mont. 257, 633 P.2d 672 (1981)."

¶92 Reversed and remanded for further proceedings consistent with this Opinion.


/S/ JAMES C. NELSON


We Concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JIM RICE


Justice Brian Morris specially concurs.

¶93 I agree that the District Court erred in concluding that the City enjoyed immunity from suit and that the City could not be liable for Shoemaker's actionable retaliatory

42

conduct. Section 2-9-111(3), MCA, would shield both the City and Shoemaker, as a member of the City Council, from a suit for damages *if* they had been engaged in the lawful discharge of an official duty associated with legislative acts. A "legislative act" includes those actions that result in creation of law or declaration of public policy. Section 2-9-111(1)(c)(i)(A), MCA. A "legislative act" does not include administrative actions. Section 2-9-111(1)(c)(ii), MCA. I fail to see how either the City's or Shoemaker's conduct constituted legislative action.

¶94 Under *Bechard v. Rappold*, 287 F.3d 827, 829 (9th Cir. 2002), a court should consider two questions when determining whether an act is legislative. First, a court must determine whether the act involves ad hoc decision making or the formulation of policy; and second, whether the act applies to a few individuals or to the public at large. *Bechard*, 287 F.3d at 829. A court also should consider whether the act was formally legislative and whether the act bears all the hallmarks of traditional legislation. *Bechard*, 287 F.3d at 829.

¶95 The City passed no laws and formulated no policies during the meeting. The City discussed no proposed laws or policies during its meeting. The City limited the discussions to Denke's HRC complaint. A decision to demote and to discharge a specific individual constitutes an "administrative" act for which legislative immunity does not apply. *Bechard*, 287 F.3d at 829. The City did not even discuss any law or formulation of new policy regarding Denke's HRC complaint. The City also made additional administrative decisions-- in direct opposition to their non-retaliation agreement--to use a larger building to accommodate greater attendance at the meeting and to allow unlimited

43

public comment on Denke's employment matter.

¶96 The City now argues that Denke, in her role as a long-time city clerk, should have "noticed that offending public officials with obnoxious comments is in itself a traditional hallmark of legislation in our country." I fail to understand how placing an item on the agenda of a public meeting specifically to denigrate a City employee's right to bring an action against her supervisor's alleged sexual harassment bears the hallmark of traditional legislation. The City enjoys no legislative immunity pursuant to § 2-9-111(3), MCA.

¶97 I agree with the Court, ¶ 88, that the doctrine of respondeat superior transfers responsibility for Shoemaker's actions to the City. Legislative immunity offers no protection to the City for Shoemaker's conduct as a City Council member because his actions were not legislative. Shoemaker's actions in no way concerned the creation of a new law or declaration of public policy. He claims to have grown concerned about Denke's HRC complaint after community members approached him to clarify the settlement amount. Shoemaker testified that these community members informed him that rumors had circulated that Denke had received a $15,000 settlement.

¶98 Shoemaker knew these rumors to be false as he had signed the settlement agreement specifying that Denke would receive $508 in medical bills and restoration of her sick leave. Shoemaker also knew that the settlement agreement obligated the City not to retaliate against Denke as a result of her decision to file the HRC complaint. Shoemaker believed, however, that the community's rumors of a higher settlement amount made him look bad and that "a finger had been pointed at him as a representative of the City." As a result, Shoemaker felt unburdened to retaliate against Denke in direct

44

contravention of the settlement agreement.

¶99 Shoemaker claimed that he wanted time on the agenda to answer questions concerning the settlement agreement arising from Denke's sexual harassment charges against the mayor: "I do not know [who got the money or what happened] as nothing has been told to me. Some one [sic] seems to want to sweep this under the carpet and not let the public know about it!" Shoemaker, as a signatory to the settlement agreement, however, possessed specific knowledge of both Denke's allegations and the terms of the settlement agreement. In fact, the City and Denke settled Denke's HRC action at a regularly called meeting of the City Council that was open to the public at Denke's election. Shoemaker attended that meeting. He reviewed the terms of the settlement agreement. And he approved the settlement agreement.

¶100 Shoemaker's insistence to have Denke's settlement agreement placed on the agenda applied solely to Denke and did not constitute policy making. Shoemaker sat on the stage at the meeting in his capacity as a member of the City Council. Shoemaker engaged in no legislative acts when he used his City Council position to smear Denke to protect his own political reputation and promote his "personal philosophy." *Bechard* provides no protection for Shoemaker's actions and he should not be allowed to seek refuge behind § 2-9-111, MCA.

¶101 Shoemaker's behavior taken as a whole, although it contains elements of speech, represents precisely the type of action that the Montana Human Rights Act prohibits. At the very least, the settlement agreement that Shoemaker signed in his official capacity precluded this type of craven attack. Denke's odyssey drives home the old maxim: "You

don't fight City Hall." *United States v. Barker*, 942 F.2d 585, 597 (9th Cir. 1991) (Noonan, J., dissenting).

/S/ BRIAN MORRIS

Justices W. William Leaphart and John Warner join in the foregoing special concurrence.

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER